[Civ. No. 27114. Fourth Dist., Div. Two. Apr. 20, 1983.]

TONY A. GREGORY et al., Plaintiffs and Respondents, v.
CITY OF SAN JUAN CAPISTRANO, Defendant and Appellant;
RANCHO ALIPAZ MOBILE HOME PARK, LTD.,
Intervener and Respondent.

COUNSEL

Duffy & Okazaki and M. Stephen Coontz for the Defendant and Appellant.

Stuart M. Parker, Ronald S. Javor, Paul Reynaga, Crystal C. Sims, Robert Cohen, Penny Patricia Nagler, Paul H. Morgan, City Attorney (Westminster), Ira Reiner, City Attorney (Los Angeles), William J. Adams, City Attorney (Palm Springs), George C. Thacher, City Attorney (San Luis Obispo), John W. Scanlon, City Attorney (Hayward), Steven F. Nord, City Attorney (Merced), Richard M. Manning, City Attorney (Capitola), Michael T. Riddell, City Attorney (Redlands), Vincent F. Biondo, Jr., City Attorney (Carlsbad), Arthur J. Shaw, Jr., City Attorney (Pismo Beach), S. L. Kabot, City Attorney (Visalia), Sabina D. Gilbert, City Attorney (Rocklin), E. A. Demchuk, City Attorney (Montclair), George W. Wakefield, City Attorney (Rancho Mirage) and K. D. Lyders, City Attorney (Oxnard), as Amici Curiae on behalf of Defendant and Appellant.

Kunath & Talley and Jim P. Mahacek for Plaintiffs and Respondents.

Tuttle & Taylor, Joseph R. Austin, William C. Schweinfurth and David B. Babbe for Intervener and Respondent.

OPINION

KAUFMAN, J.—The City of San Juan Capistrano (City) appeals from a judgment declaring its mobilehome park rent control ordinance invalid and enjoining enforcement of the ordinance.

*Facts*

This action was instituted by mobilehome park owners Tony A. Gregory and Nancy M. Gregory dba Rancho Del Avion Mobilehome Park, seeking a declaration of the unconstitutionality of City's mobilehome rent control ordinance and an injunction against its enforcement. The parties filed cross-motions for summary judgment. Another park owner, Rancho Alipaz, a limited partnership, was permitted to intervene and join in the Gregorys' summary judgment motion. In due course, the court granted summary judgment in favor of the Gregorys and Rancho Alipaz (collectively plaintiffs) having concluded that City's ordinance was preempted by state law and unconstitutional.

During the proceedings in the trial court City amended its ordinance numerous times, partly in an effort to meet constitutional objections raised by plaintiffs in this litigation.[1] The ordinance, repealed and reenacted, was again amended after the rendition of judgment in the trial court and City's filing its notice of appeal. The latest version is embodied in ordinance No. 439 enacted November 3, 1981, as amended by ordinance No. 456 enacted May 4, 1982.[2]

■ City urges it is the current version of the ordinance which we must review. Rancho Alipaz objects in part, pointing out that the latest version of the ordinance has not been administratively interpreted and further, that while it believes it will be appropriate to attack the constitutionality of the ordinance as applied, the factual matrix for such an attack must be developed in an administrative hearing and trial court proceeding before this court may review it. We agree in essence with both parties.

---

[1] The City's first rent control legislation was ordinance No. 412, enacted November 5, 1980. Seven months later, on May 5, 1981, the City amended ordinance No. 412 by ordinance No. 423. Within a month before the grant of a preliminary injunction on July 27, 1981, the City amended its ordinance twice, in ordinance No. 425, enacted July 7, 1981, and ordinance No. 427, enacted July 21, 1981. A little more than a month later, ordinance No. 430 was enacted on September 1, 1981. On November 3, 1981, some two and a half weeks after plaintiffs filed a motion for summary judgment, the City repealed ordinances 412, 423, 425, 427 and 430, and enacted ordinance No. 439 in their place. Ordinance No. 439 itself has since been amended, as mentioned in the text, *infra*, by ordinance No. 456, enacted May 4, 1982, during the pendency of this appeal.

The first version of the rent control ordinance, ordinance No. 412, contained several provisions which, arguably, were subject to serious constitutional attack. It put a ceiling of 9 percent on annual rent increases, regardless of park owner costs or the general inflation rate. It provided that a park owner could adopt no rules or regulations "relating to personal actions, age limits, [or] the health, safety and welfare of residents" until such rules or regulations had been approved in writing by a majority of the park residents. Further, while providing for a petition mechanism to allow for rent increases beyond the 9 percent ceiling (cf. fn. 4, *infra*, and accompanying text), the mechanism did not provide for any deadline within which dispositive action had to be taken. Finally, the ordinance made no reference to any right of park owners to receive a fair return on the value of their property except perhaps in a reference to the need of park owners "to receive a 'fair return' on their investment" in the statement of purpose.

[2] Ordinance No. 439 enacted article 9 of chapter 2 of title 2 of the San Juan Capistrano Municipal Code. Ordinance No. 456 amended that article.

Rancho Alipaz is correct that before this court may consider an attack on the constitutionality of the ordinance as applied a factual matrix must be developed in the appropriate tribunal below. Therefore, the present appeal is limited to a review of the facial constitutionality and validity of the ordinance. (See, e.g., *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].) However, City is correct that as to facial constitutionality and validity it is the ordinance now in effect that is to be reviewed. Absent due process considerations or problems of unfairness, when there has been a change in the law after rendition of judgment in the trial court, the law to be considered and applied by the reviewing court is the law in effect at the time of its decision. (*Bradley* v. *Richmond School Board* (1974) 416 U.S. 696, 711-715 [40 L.Ed.2d 476, 488-490, 94 S.Ct. 2006]; *Thorpe* v. *Housing Authority* (1969) 393 U.S. 268, 281-282 [21 L.Ed.2d 474, 484, 89 S.Ct. 518]; cf. *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 125 [109 Cal.Rptr. 799, 514 P.2d 111].) As to the absence of an administrative interpretation of the language of the ordinance, suffice it to say that for purposes of determining facial constitutionality this court is competent to interpret the language of the ordinance, which is in the final analysis a judicial function. (*Sanchez* v. *Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 67 [141 Cal.Rptr. 146, 569 P.2d 740]; *Lake Forest Community Assn.* v. *County of Orange* (1978) 86 Cal.App.3d 394, 407 [150 Cal.Rptr. 286].)

Ordinance No. 439 as amended by ordinance No. 456 sets forth rent increase formulae which allow a park owner to pass on increased operating expenses measured by the percentage of increase in the Consumer Price Index (CPI) plus another 10 percent of that or, alternatively, to increase rents by the percentage of increase in a modified CPI plus 10 percent of that percent.[3] A park owner is allowed only one increase per year by use of the formulae. However, the ordinance provides for a five-member mobilehome park review committee[4]

[3]The formulae are: "Take operating expenses of the park for the twelve month period immediately preceding the date upon which notification of any rent increase is to be made;

"Multiply that sum by the percentage of increase in the CPI-U appearing in the latest published Consumer Price Index;

"Multiply that produce [*sic*] by a factor of 1.1 to arrive at the maximum allowable annual increase in rent for the entire park;

"Divide by the number of units in the park to compute the maximum allowable annual rent increase (in dollars) for each space.

"or

"Secure the 'percentage of increase' in CPI-U appearing in the latest published Consumer Price Index prior to the date upon which notification of any rent increase is to be given;

"Compute a 'Modified CPI-U' which applies to rental of mobilehome spaces by deleting those items in the CPI-U which do not have a substantial bearing upon the rental of mobilehome spaces; i.e., Food and Beverage; Apparel and Upkeep; Entertainment; Medical Care;

"Multiply the above 'Modified CPI-U' by a factor of 1.1 to arrive at the maximum allowable rent increase percentage and apply that product to each space rent." (§ 2-2.902(d).)

[4]The park review committee is to consist of five voting members, two of which are mobilehome owners, two of which are park owners, operators or managers, and one person who is neither a mobilehome owner, mobilehome park owner, operator nor manager.

(Committee) to receive and consider petitions for rent increases in excess of the formulae.

No later than 30 days after its receipt of a petition the Committee must hold a public hearing to determine the necessity or justification for the proposed rent increase. The Committee's decision on the proposed increase must be made no later than 10 days after the conclusion of the public hearing and the Committee is to "forthwith" transmit its findings and recommendations to the city council. Decisions of the Committee are to be reviewed by the city council at the next regularly scheduled council meeting at least 10 days after the Committee makes its decision. The city council is to make its decision in writing within 10 days after it reviews the decision of the Committee. In passing on the proposed rent increase, both the Committee and the council are to "consider all relevant factors, including, . . . a fair rate of return on investments and increased property values."

The ordinance as amended also contains what City refers to as "reciprocal" provisions purporting (1) to grant "the residents" a preemptive right to purchase the mobilehome park in which they reside on the terms and conditions contained in any offer acceptable to the owner and (2) to give the park owner a preemptive right to purchase the mobilehome of any resident on the terms and conditions of any offer acceptable to the resident.

### Contentions, Issues and Discussion

Four principal questions are presented on appeal: (1) whether the ordinance is preempted by state law; (2) whether the ordinance takes private property without due process by denying owners a just return on the value of their property; (3) whether the ordinance imposes upon park owners an unconstitutional choice between giving up their right to privacy or their right to a fair return on their property; and (4) whether the ordinance's granting "the residents" a preemptive right to purchase the mobilehome park constitutes an unconstitutional taking of private property without just compensation.

### I. Preemption

Respondents assert that City's mobilehome rent control ordinance is preempted by the combined effect of two state acts, the Mobilehome Residency Law (Civ. Code, § 798 et seq.) and the Mobilehome Parks Act (Health & Saf. Code, § 18200 et seq.). The trial court agreed. We do not.

### Direct Conflict

Article XI, section 7, of the California Constitution provides that a city "may make and enforce within its limits all local, police, sanitary and other or-

dinances and regulations not in conflict with general laws." Any local law that directly conflicts with state legislation is void. (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 856 [76 Cal.Rptr. 642, 452 P.2d 930]; see *Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807 [100 Cal.Rptr. 609, 494 P.2d 681]; *Music Plus Four, Inc.* v. *Barnet* (1980) 114 Cal.App.3d 113, 121-123 [170 Cal.Rptr. 419].)

■ Although plaintiffs do not agree entirely in their analysis, they both assert that portions of the Mobilehome Residency Law, primarily Civil Code section 798.18 read in combination with section 798.15, establish at least a limited form of statewide rent control for mobilehome park tenancies and that City's ordinance is in conflict with or will substantially interfere with the operation of the state legislation. Not so.

(All statutory references will be to the Civil Code unless otherwise specified.) Section 798.15 enumerates a number of provisions required to be in mobilehome park rental agreements including the "term of the tenancy and the rent therefor." Section 798.16 provides that a rental agreement "may include such other provisions permitted by law, but need not include specific language contained in state or local laws not a part of [the Mobilehome Residency Law]." Section 798.18 reads: "(a) A homeowner shall be offered a rental agreement for (1) a term of 12 months, or (2) a lesser period as the homeowner may request, or (3) a longer period as mutually agreed upon by both the homeowner and management. [¶] (b) No such agreement shall contain any terms or conditions with respect to charges for rent, utilities, or incidental reasonable service charges that would be different during the first 12 months of the agreement from the corresponding terms or conditions that *would be* offered to the homeowners on a month-to-month basis."[5] (Italics added.)

Plaintiffs' argument that section 798.18 establishes a form of rent control rests on two premises, both of which are faulty: (1) that the rent specified must be no more in amount than the rent being paid by homeowners already in the park who are renting on a month-to-month basis; and (2) that the rent specified in the rental agreement must remain the same throughout the first 12 months of the term of the rental agreement.

---

[5]The quoted language is from section 798.18 as amended in 1982. (Stats. 1982, ch. 1397, § 6, p. 5320.) At the time of the proceedings in the trial court, section 798.18 read: "(a) A tenant shall be offered a rental agreement for (1) a term of 12 months, or (2) a lesser period as the tenant may request, or (3) a longer period as mutually agreed upon by both the tenant and management. [¶] (b) No such agreement shall contain any terms or conditions with respect to charges for rent, utilities, or incidental reasonable service charges that would be different during the first 12 months of the agreement from the corresponding terms or conditions that would be offered to the tenant or tenants on a month-to-month basis." (Stats. 1981, ch. 667, § 4, p. 2450.)

The first premise is based on the assumption that the requirement there be no different terms during the first 12 months than "would be offered *to the homeowners* on a month-to-month basis" refers to the homeowners already in the park on a month-to-month basis. But, as several amici point out, that is palpably incorrect. The terms and conditions must be the same as those that *"would be offered"* to the requesting homeowner or other homeowners on a month-to-month basis at the time the 12-month agreement is offered, not the terms and conditions that *were offered* to the homeowners already in the park at some past time. "Would be offered" connotes "at that time" and, perhaps, "at a future time"; it cannot refer to what was offered in the past.

As to plaintiffs' second premise, City and a number of amici are correct in pointing out there is nothing in section 798.18, section 798.15 or any other provision of the Mobilehome Residency Law that requires the rent specified in the rental agreement to remain the same for the entire 12-month period. The parties are at liberty to agree upon any lawful provision (§ 798.16) and may provide in the rental agreement for periodic changes in rent on any basis they find mutually acceptable, provided that on the effective date of any increase the rent is not greater than would then be offered to a like month-to-month tenant.

Our attention is called to a number of statements in legislative committee reports, bill digests and the like within the legislative history of section 798.18 (originally enacted as Senate Bill No. 258 and codified as § 789.14) to the effect that the 12-month lease provision would provide a measure of "rental rate stability" for the renter. Indeed, in one Senate Judiciary Committee report the statement is found: "A written rental agreement for 12 months would also include a stable monthly rental fee for the same period of time." Such statements were, however, mere assumptions completely unwarranted by the language of the statute. ■ The language used must be the primary basis for construction of a statute and no assumption as to its effect mentioned in bill digests or analyses which is not warranted by its language can change the plain meaning of the language used. (*People* v. *Belleci* (1979) 24 Cal.3d 879, 884, 886 [157 Cal.Rptr. 503, 98 P.2d 473], and cases cited; *Hennigan* v. *United Pacific Ins. Co.* (1975) 53 Cal.App.3d 1, 7 [125 Cal.Rptr. 408].)

■ We also observe that the dominant purpose of the Mobilehome Residency Law as found in the statute itself is that mobilehome owners within a park be afforded a measure of security by "protection from actual or constructive eviction . . . ." (Civ. Code, § 798.55, subd. (a).) The Third Reading Analysis prepared by the Assembly Office of Research with respect to Senate Bill No. 258 stated in part: "Most mobilehome park tenancies are from month to month. Typically, mobilehome park operators refuse to give longer leases." Under "comment" the Senate Committee on Judiciary Report on Senate Bill No. 258 stated in part: "This bill purports to relieve the insecurity of

mobilehome renters by their ability to request a written rental agreement for at least 12 months."

We conclude the Mobilehome Residency Law does not regulate or control the amount of rent or changes in rent the park owner and homeowner may agree upon except that any increase in rent within the first 12 months may not exceed the rent that would be offered to the homeowner or a like homeowner on a month-to-month basis at the effective date of the increase. The purpose of section 798.18 is to afford homeowners a measure of stability and predictability in respect to their mobilehome park residency; the requirement that the terms and conditions be not different in the first 12 months from those that would be offered to month-to-month tenants was enacted simply to prevent discrimination against homeowners who exercise their statutory right to a 12-month term rather than accept a month-to-month tenancy.

The Mobilehome Residency Law is not and was not intended to be a rent control measure, and there is no actual conflict between it and City's ordinance.

*State Occupation of the Field*

■ "A local ordinance may be in conflict with state law even where there is no direct conflict, if the state has fully occupied the field of the legislation. '. . . If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation . . . .' (*Lancaster* v. *Municipal Court* [*supra*] (1972) 6 Cal.3d 805, 807-808 [100 Cal.Rptr. 609, 494 P.2d 681].)" (*Music Plus Four, Inc.* v. *Barnet, supra,* 114 Cal.App.3d at p. 121.)

"The question whether the Legislature intended to fully occupy an entire field of activity so as to preclude local regulation under the city's police power must be answered in the light of the facts and circumstances surrounding each case. However, analysis of the many prior decisions on the subject of state preemption indicates that the doctrine is inapplicable unless: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' (*In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809], overruled on another point in *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].)" (*Music Plus Four, Inc.* v. *Barnet, supra,* 114 Cal.App.3d at p. 123; accord: *Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 859-860.)

Except for asserting that City has no unique local problems justifying its imposition of rent control on mobilehome spaces and implying that the effect of the rent control ordinance will be to perpetuate the tenancies of mobilehome owners already residing in mobilehome parks and thereby render mobilehome spaces even less available than they already are for transient mobilehome owners or newcomers to the city, plaintiffs do not specifically contend the adverse effects of the ordinance on the transient citizens of the state outweigh possible benefits to the city.[6] Their arguments are directed at demonstrating that the subject matter has been so fully and completely covered by state law as to clearly indicate it has become exclusively a matter of state concern or that the subject matter has been partially covered by state law in such terms as to indicate clearly a paramount state concern that will not admit of local legislation.

■ Although all arguments of the plaintiffs are not identical, they may be summarized as follows. It is urged that in enacting and adding to the Mobilehome Residency Law and the Mobilehome Parks Act over the last decade, the Legislature has developed a systematic and comprehensive scheme of regulation of the economic relationships between park owners and residents, including the at least limited form of rent stabilization assertedly found in section 798.18. It is further urged that the state scheme, elaborate in detail and constituting a "patterned approach to the subject," evidences a legislative intent to fully occupy the field. This intent is further evidenced, it is claimed, by the fact the Legislature considered but failed to enact bills proposing a formula approach to rent control in mobilehome parks at various times during the enactment, recodification and amendment of the Mobilehome Residency Law. It is also asserted that the problems the state legislation sought to deal with are the same problems City seeks to deal with by enactment of its ordinance.

A good deal of emphasis, undue in our view, is laid on a statement by the Legislative Counsel in a digest to the 1978 recodification of the Mobilehome Residency Law that the existing law contained a "comprehensive scheme of regulation of tenancies in a mobilehome park." (See Legis. Counsel's Digest of Sen. Bill No. 2119, Stats. 1978, ch. 1031 (No. 6 Deering's Adv. Legis. Service, p. 1346).) Subsequently, however, the Legislative Counsel restated his characterization of the law as creating merely a "comprehensive scheme regulating *various facets* of the landlord and tenant relationship [in mobilehome parks]." (Legis. Counsel's Digest of Assem. Bill No. 709, Stats. 1979, ch. 493, (No. 4 Deering's Adv. Legis. Service, p. 166), italics added.)

Nevertheless, we agree with the thrust of several of plaintiffs' assertions. Although they are not identical, there are similarities between the problems

---

[6]In any event there is no evidence the effects of this rent control ordinance on transient citizens would be more deleterious than the rent control ordinance involved in *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129.

sought to be dealt with by the state legislation and City's ordinance and in a broad sense their purposes may be said to be similar. Also, the state legislation is fairly detailed and comprehensive in respect to those aspects of mobilehome park residency it purports to regulate. What we cannot agree with, however, is plaintiffs' conclusion that the state legislation manifests a legislative intent fully to occupy the field or to establish the regulation of rent in mobilehome parks as a paramount matter of state concern to the exclusion of local legislation.

As always in considering a claim of preemption by implication, the question is what is the relevant "field." Although the state legislation comprehensively regulates those aspects of mobilehome park residency it purports to deal with, it simply does not purport to regulate rents except for proscribing rent discrimination against homeowners who exercise their statutory right to request a 12-month rental agreement. Thus, if the relevant field is characterized as rent control in mobilehome parks, there is virtually no state legislation on the subject and no occupation of the field, either full or partial.

It is only if the relevant field is defined as the relationship between resident mobilehome owners and mobilehome park owners that plaintiffs' position is even arguable. If the field is so defined, the second *Hubbard* standard is the one pertinent: Has the subject matter "been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action"? (62 Cal.2d at p. 128; *Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 859-860.)

The only argument advanced that might conceivably evidence a paramount state concern so pervasive as to preclude local mobilehome park rent control is that the Legislature has at various times considered and rejected proposed legislation for formula rent control in mobilehome parks and, thus, must have intended there be none. Plaintiffs assert that surely the state Legislature would not itself reject rent control legislation and yet countenance the enactment of rent control legislation by a municipality or worse yet the enactment of different rent control ordinances by numerous municipalities.

It is conceivable that plaintiffs are correct, but we are not persuaded. The nonenactment of legislation is an exceedingly unreliable indicator of legislative intent and an exceedingly weak reed upon which to rest a preemption of the exercise by a municipality of its police powers. (*State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 63 [152 Cal.Rptr. 153]; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 58 [69 Cal.Rptr. 480]; see *Pitney-Bowes, Inc.* v. *State of California* (1980) 108 Cal.App.3d 307, 319 [166 Cal.Rptr. 489].) There are many possible reasons for the Legislature's rejections of the bills it considered, including the possibility it felt rent control might be more appropriately dealt with at the local or regional level.

Moroever, there are in the Mobilehome Residency Law a number of provisions that appear to expressly recognize the possibility of local ordinances and local regulation relating to mobilehome park tenancies. For example, section 798.16 states: "The rental agreement may include such other provisions permitted by law, but need not include specific language contained in state *or local laws* not a part of this chapter." (Italics added.) And section 798.56, subdivision (a) provides: "A tenancy shall be terminated by the management only for one or more of the following reasons: (a) Failure of the homeowner to comply with a *local ordinance* or state law or regulation *relating to mobilehomes* within a reasonable time after the homeowner receives a notice of noncompliance from the appropriate governmental agency." (Italics added.)

Even more significantly, perhaps, a section of the Mobilehome Parks Act contains an express preemption provision: "The provisions of this part apply to all parts of the state and supersede any ordinance enacted by any city, county, or city and county . . . applicable to the provisions of this part." (Health & Saf. Code, § 18300, subd. (a).) This explicit preemption of the health and safety aspects of mobilehome park residency contrasts with the absence of any explicit preemption in the Mobilehome Residency Law, not to mention the express references in the Mobilehome Residency Law to local ordinances and law.

We conclude that the Mobilehome Residency Law regulates various aspects of residency in mobilehome parks, but not to any significant extent the amount of permissible rents. In this respect the situation is not unlike that noted in the *Birkenfeld* decision in which various Civil Code provisions were found to constitute extensive regulation of many aspects of the landlord-tenant relationship but not to preempt the substance of the City of Berkeley's rent control ordinance. (17 Cal.3d at pp. 141-142.)

## II. *Unconstitutional Standard*

■ Plaintiffs contend a park owner is entitled to receive a just and reasonable return on the value of his property and assert that the standard for rent increases embodied in City's ordinance is unconstitutional because it recognizes only an owner's right to a fair return on "investment" rather than the value of the property. Not so.

Plaintiffs are correct that to accord with due process of law a rent control ordinance must permit rents that will allow an efficient owner a fair return on the value of his property. (*Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65, 70, 79]; cf. *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 165.) City does not contend otherwise. But fairly construed, the standard embodied in the ordinance does recognize that right.

The ordinance's statement of purpose reads in relevant part: "This council does, accordingly, find and declare that it is necessary to protect the residents of mobilehomes from unreasonable space rent increases, recognizing the need of mobilehome park owners to receive a *'fair return' on their investment* and revenues sufficient to cover any increased costs of repairs, maintenance, insurance, upkeep and additional amenities." (Ord. 439, § 2-2.901; italics added.) Focusing on this statement and labeling it "the standard," plaintiffs argue the language used does not recognize increased property values, only the owner's "investment."

However, "return on their investment" is perfectly susceptible to interpretation as including the value of the owner's property. In a broad but very real sense the value of an owner's property is his "investment." The owner could, at any given moment, sell the park at its fair market value. By retaining the property and not selling it, the owner has in effect reinvested in the property the dollar amount of its increase in market value. Thus, the owner's "investment" includes the amount of any increase in fair market value of his property, and "return on their investment" is logically and reasonably interpreted as meaning "return on their investment including any increase in the fair market value of the property."

Principles of statutory construction lead to the same conclusion. The ordinance provides that in evaluating a petition for rent increase both the committee and the city council are to "consider all relevant factors, including, . . . a fair rate of return on investments and *increased property values*." (Ord. 456, § 2-2.905(g); italics added.) Plaintiffs argue that this mandate is found only in the enumeration of factors to be considered and is not part of the ordinance's standard against which the reasonableness of a requested rent increase is to be measured. We see, however, no sound reason to classify the language found in the statement of purpose as being the ordinance's sole standard and relegating the language mandating the committee and city council to consider increased property values to a less important stature. The words of a statute and its provisions are to be read as a whole. (*Woodmansee* v. *Lowery* (1959) 167 Cal. App.2d 645, 650 [334 P.2d 991]; *Taylor* v. *Lundblade* (1941) 43 Cal. App.2d 638, 641 [111 P.2d 344].) Further, they must be read in light of the cardinal principle that a statute is to be construed in a way that will avoid its unconstitutionality. (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 942 [92 Cal.Rptr. 309, 479 P.2d 669]; *In re Marriage of Walton* (1972) 28 Cal.App.3d 108, 117 [104 Cal.Rptr. 472].)

We conclude that, facially, the standards embodied in the ordinance recognize the right of park owners to a fair and just return on the value of their property. We may not assume the ordinance will be administered other than in a manner that will afford owners their rights under the Constitutions of the

United States and the State of California. (See *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 149 [82 P.2d 434, 126 A.L.R. 838].)

### III. *Right of Privacy*

Plaintiffs contend that City's ordinance unconstitutionally imposes upon mobilehome park owners the necessity of choosing between their constitutional due process right to a fair return on the value of their property and their constitutional right to privacy. ▆ To the extent the constitutional right to privacy is implicated, we observe that the right is not absolute and in cases of legitimate business regulations must be balanced against the government's right and duty to exercise its police powers for the public good. (Cf., e.g., *Wilson* v. *California Health Facilities Com.* (1980) 110 Cal.App.3d 317, 321-325 [167 Cal.Rptr. 801], and authorities there cited.) However, the ordinance does not on its face require either the surrender of private financial data or deny park owners a constitutionally minimum fair return on the value of their property or require a choice between the two. Therefore, the issue is not ripe for adjudication. Only the facial constitutionality of the ordinance is at issue in this appeal.

### IV. *Preemptive Right of "The Residents" to Purchase the Park*

▆ Section 2-2.906(a) of the ordinance requires an owner who desires to sell his mobilehome park first to offer it to "the residents," and if they decide to purchase it, the owner must sell it to them.[7] Plaintiffs contend this portion of the ordinance not only abrogates a park owner's right to control the disposition of his or her property but also takes away the right to sell a preemptive right in the property and that this appropriation of well-recognized property rights without payment of compensation constitutes an impermissible taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution and sections 1 and 19 of article I of the California Constitution. We agree and therefore affirm that part of the judgment invalidating this portion of the ordinance. (See *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 272 [157 Cal.Rptr. 372, 598 P.2d 25].)

---

[7]Section 2-2.906 reads in pertinent part: "(a) Sales of parks. Before the sale of any mobilehome park, the park owner shall notify a designated representative of the residents of his intent to sell. Such notification shall specify the sales price; the terms and conditions of the sale; and a date (not to exceed ten (10) days) within which a response from the residents will be accepted. The residents, through their designated representative, within the specified time, shall notify the park owner that the residents will purchase the park on the terms and conditions set forth in the notice; present a counter offer; or decline to purchase the park.

"If the residents elect to purchase the property in accordance with the terms and conditions set forth in the park owner's notice, the sale shall be consummated in accordance with the terms and conditions set forth therein. If a counter offer is made by the residents, the park owner shall have ten (10) days within which to respond thereto. If the residents decline to purchase the park, or if their counter offer if [*sic*] rejected by the park owner, the park owner shall be free to sell the park in accordance with the terms and conditions set forth in his original notice."

■ The protection of private property rights is guaranteed by the Fifth Amendment to the United States Constitution. "No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." Article I, section 19, of the California Constitution similarly mandates that "Private property may be taken or damaged for public use only when just compensation . . . has first been paid to . . . the owner." The term property is not used in the "vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law . . . . [Instead it] denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use *and dispose of it*. . . . The constitutional provision is addressed to every sort of interest the citizen may possess." (*U.S.* v. *General Motors Corp.* (1945) 323 U.S. 373, 377-378 [89 L.Ed. 311, 318, 65 S.Ct. 357]; italics added.)

■ Although government, in the exercise of its police power, may properly regulate the use of property, a regulation may nonetheless be so onerous as to constitute a taking of property requiring the payment of compensation. (See *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260-261 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138]; *Kaiser Aetna* v. *United States* (1979) 444 U.S. 164, 178 [62 L.Ed.2d 332, 345, 100 S.Ct. 383].) The determination as to whether a regulation goes so far as to constitute a taking involves a balancing of the governmental interest sought to be advanced by regulating in the specified manner against the gravity of the interference with or impact on property rights resulting from the regulation. (*Agins* v. *Tiburon, supra*; *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646]; see *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 880, 102 S.Ct. 3164]; cf. *Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 244-249 [57 L.Ed.2d 727, 736-739, 98 S.Ct. 2716]; see *The Supreme Court 1977 Term*, 92 Harv.L.Rev. 5, 98.) Application of this balancing test to the instant case results in the unavoidable conclusion that an unconstitutional taking is effected by this part of the ordinance.

■ This part of the ordinance effects an outright abrogation of well-recognized property rights. The ability to sell and transfer property is a fundamental aspect of property ownership. Property consists mainly of three powers: possession, use, and *disposition. (U.S.* v. *General Motors Corp., supra*, 323 U.S. at pp. 377-378 [89 L.Ed. at p. 318].) California courts have long recognized the fundamental importance of an owner's right, absent an illegal purpose, to sell property to whomever the owner chooses. "The constitutional guaranty securing to every person the right of 'acquiring, possessing, and protecting property,' . . . includes the right to dispose of such property in such innocent manner as he pleases . . . ." (*Ex Parte Quarg* (1906) 149 Cal. 79, 80 [84 P. 766 ]; see *Tennant* v. *John Tennant Memorial Home* (1914) 167 Cal. 570, 575 [140 P. 242]; *Laguna Royale Owners Assn.* v. *Darger* (1981) 119

Cal.App.3d 670, 681 [174 Cal.Rptr. 136].) This part of the ordinance simply appropriates an owner's right to sell his property to persons of his choice. City has thus "extinguish[ed] a fundamental attribute of ownership," in violation of federal and state Constitutions. (See *Agins* v. *Tiburon, supra,* 447 U.S. at p. 262 [65 L.Ed.2d at p. 113].)

In addition, this part of the ordinance appropriates the owner's legally recognized right to sell a right of first refusal or preemptive right in the mobilehome park. It is well established that a preemptive right is a valuable property right which may be bought, sold, and enforced in a court of law. (See *Nelson* v. *Reisner* (1958) 51 Cal.2d 161, 165-167 [331 P.2d 17]; *Ablett* v. *Clauson* (1954) 43 Cal.2d 280, 284-287 [272 P.2d 753]; *Mercer* v. *Lemmens* (1964) 230 Cal.App.2d 167, 170-171 [40 Cal.Rptr. 803]; *Schwartz* v. *Shapiro* (1964) 229 Cal.App.2d 238, 255-256 [40 Cal.Rptr. 189]; cf. *County of San Diego* v. *Miller* (1975) 13 Cal.3d 684 [119 Cal.Rptr. 491, 532 P.2d 139].) An owner can no longer sell this right because it has been taken by the City and granted to the park "residents."

This is not a case where the infringement upon property rights is the incidental and largely unavoidable byproduct of legislation designed to achieve some other beneficent purpose. This part of the ordinance has no other effect than to take away the owner's right to sell to the purchaser of his or her choice and grant to the park residents a preemptive right to purchase the owner's property. As early as 1798, Justice Chase expressed constitutional law's undisputed condemnation of a law that "takes property from A. and gives it to B." (*Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386, 388 [1 L.Ed. 648, 649].) Nor may City be permitted to achieve this impermissible result under the guise of an adjunct to rent control.

It is true that in certain circumstances government may abrogate or impair property rights without compensation in the exercise of its police powers, but such circumstances are narrowly circumscribed. (*Loretto* v. *Teleprompter Manhattan CATV Corp., supra,* 458 U.S. at p. 432 et seq. [73 L.Ed.2d at p. 880 et seq.]; see *Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. at pp. 124-129 [57 L.Ed.2d at pp. 648-651]; see and cf. *Allied Structural Steel Co.* v. *Spannaus, supra,* 438 U.S. at pp. 242-244 [57 L.Ed.2d at pp. 734-736]; *United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 22 [52 L.Ed.2d 92, 109-110, 97 S.Ct. 1505]; *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 305-308 [152 Cal.Rptr. 903, 591 P.2d 1].) Here the only purpose identified by City as being served by this part of the ordinance is affording "mobilehome residents a measure of control over their own living situations." The suggested justification is entirely insufficient to legitimate the uncompensated appropriation of significant private property rights.

City attempts to avoid the inevitable conclusion that the right of first refusal provisions of the ordinance constitute an unconstitutional taking by pointing to two cases that have upheld the validity of preemptive rights. Neither of these cases, however, has any relevance here. Both of these cases involve *voluntary* grants of preemptive rights; neither involves, as does the instant case, a taking of such rights by government.

*Ritchey* v. *Villa Nueva Condominium Assn.* (1978) 81 Cal.App.3d 688 [146 Cal.Rptr. 695, 100 A.L.R.3d 231], held that a right of first refusal provision in the bylaws of the condominium owners association did not constitute an unreasonable restraint on alienation. No claim was raised or could have been raised that the state had somehow taken a right of first refusal; the plaintiff had voluntarily granted this right to the owners association.

*Post* v. *Prati* (1979) 90 Cal.App.3d 626 [153 Cal.Rptr. 511], is similarly inapposite. In *Post,* plaintiffs challenged the constitutionality of California Public Resources Code section 6922 (now Cal. Pub. Resources Code, § 6912). Section 6922 provided that where the state had sold property subject to a reservation of geothermal resource rights, the surface owner would have a preemptive right to any geothermal leases subsequently sold by the state. The court rejected plaintiffs' contention that the granting of preemptive rights violated the gift prohibition in the state Constitution. Plainly, the court's holding that the state could properly *grant* preemptive rights in its own property is irrelevant to the issue of whether government may properly *take* such rights from a private party without payment of compensation.

In sum, no court has ever upheld the naked taking of the preemptive rights involved here. City has unwittingly conceded this point in claiming that the ordinance "in granting rights to private parties for the public good, is similar to [the] New York statute . . . in *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1981) 53 N.Y.2d 124." After City's opening brief was filed, the United States Supreme Court held the statute at issue in *Loretto*, which required landlords to allow the installation of cable television facilities by private companies for the use of tenants, constituted an unconstitutional taking of property without compensation. (*Loretto* v. *Teleprompter Manhattan CATV Corp., supra,* 458 U.S. 419 [73 L.Ed.2d 868].)

Although the right of first refusal purportedly given in the ordinance to park owners with respect to any mobilehome for sale in the park is referred to as being "reciprocal," it is not seriously urged that such an unsolicited and perhaps unwanted preemptive right given the owner, even if itself constitutional, could validate an otherwise unconstitutional taking of the owner's property rights.

City urges and all parties seem to agree that the portion of the ordinance purporting to give these reciprocal rights of first refusal are severable, not from each other, but from the remainder of the ordinance. We agree. Invalidity of this part therefore will not require invalidation of the entire ordinance.

## Disposition

Insofar as it determines section 2-2.906 of the ordinance unconstitutional and enjoins its enforcement, the judgment is affirmed. In all other respects the judgment is reversed. Because plaintiffs have prevailed in part on appeal and by instituting and maintaining this action have caused numerous amendments to the ordinance to eliminate constitutionally questionable provisions and omissions (see fn. 1, *ante*), in the interests of justice, plaintiffs shall recover costs on appeal.

Morris, P. J., and Trotter, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.