[No. 21705-8-II.    Division Two.    February 27, 1998.]

MANUFACTURED HOUSING COMMUNITIES OF WASHINGTON, *Appellant*, v. THE STATE OF WASHINGTON, ET AL., *Respondents*.

*John D. Blankinship* of *Montgomery, Purdue, Blankinship & Austin, P.L.L.C.*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Joseph J. Randazzo, Assistant*; and *Dan R. Young* of *Bjorklund & Young*, for respondents.

SEINFELD, J. — Manufactured Housing Communities of Washington brought this facial challenge to the constitutionality of RCW 59.23, the Mobile Home Parks—Resident Ownership Act, a statute that grants mobile home park residents a right to purchase the park if the park owner decides to sell. Finding no unconstitutional taking of property under the Washington State or United States Constitution, we affirm the trial court's dismissal of the action.

## FACTS

Manufactured Housing Communities (the Park Owners) is a nonprofit corporation representing the interests of mobile home park owners. The Park Owners filed this declaratory judgment action in superior court, arguing that the Act allows a taking of property without just compensation under both the state and federal constitutions.

After the trial court denied the Park Owners' motion for summary judgment and dismissed the action, the Park Owners brought this appeal. They contend that the Act derogates, infringes upon, or impairs their fundamental ownership right to possess, exclude others, and dispose of their property, and thus, constitutes an unconstitutional taking. They also argue that Article I, Section 16, of the Washington State Constitution provides greater protection against takings than does the Fifth Amendment of the United States Constitution. Accordingly, the Park Owners ask this court to reverse the trial court's ruling and invalidate the Act.

## Standard of Review

■ When reviewing an appeal from summary judgment, an appellate court engages in the same analysis as the trial court. *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 634, 854 P.2d 23 (1993). Issues of law are reviewed de novo; issues of fact are reviewed in the light most favorable to the nonmoving party. *Margola*, 121 Wn.2d at 634. As this is a facial challenge, there are no facts in dispute.

## The Act

In 1993, the Washington State Legislature adopted RCW 59.23, which allows tenants of mobile home parks to exercise a right of first refusal if the park owner decides to sell the park. RCW 59.23.025. It found that mobile home park housing provides a valuable source of affordable housing and that the availability of sites for such housing was becoming "increasingly . . . insecure." *See* RCW 59.23.005.

To exercise their right of first refusal, the tenants must organize into a "qualified tenant organization" and give written notice to the owner that they "have a present and continuing desire to purchase the mobile home park." RCW 59.23.015. A park owner who has received such notice must, upon reaching an agreement with a third party to sell the park, notify the tenants of the pending sale and

disclose the terms. The tenant organization then has 30 days from receipt of notice to produce two percent of the agreed purchase price under the original agreement, along with a "fully executed purchase and sale agreement at least as favorable to the park owner as the original agreement."[1] RCW 59.23.025.

If the tenants perform as stated, the owner must sell the park to the tenants. RCW 59.23.025. If the tenants fail to perform under the terms of their contract, the owner may proceed with a sale to any other party pursuant to the contract terms. RCW 59.23.025. If the owner fails to notify the tenants of a pending third party sale, the sale is voidable upon application to superior court. RCW 59.23.030.

## I. ARTICLE I, SECTION 16: *Gunwall* ANALYSIS

According to the Park Owners, the textual and historical differences between article I, section 16, of the Washington State Constitution and the Fifth Amendment of the United States Constitution takings clause demonstrate that the drafters of the state constitution intended to afford Washington residents greater protection than the federal document provides. The Park Owners support their argument with a *Gunwall* analysis. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986). Thus, we first analyze the state constitution. *Malyon v. Pierce County*, 131 Wn.2d 779, 791, 935 P.2d 1272 (1997).

Washington courts have recognized that article I, section 16, of the Washington State Constitution extends protection equivalent to the takings clause of the Fifth Amendment. *Orion Corp. v. State*, 109 Wn.2d 621, 657, 747 P.2d 1062 (1987). But the courts have not addressed whether the state constitution provides greater protection. The State contends that the theories underlying regulatory takings arose from federal constitutional jurisprudence and that the text and the history of article I, section 16, reveal

---

[1]The Act exempts the transfer or sale of a park to a relative. RCW 59.23.025, .035.

that the framers intended this provision to control only formal eminent domain proceedings.

## The Text of the State Constitution and its Parallels with the Federal Document

■■■ We begin by examining the six nonexclusive factors set forth in *Gunwall*, 106 Wn.2d at 58. The first two are: (1) the textual language of the state constitutional provision at issue and (2) differences in the parallel texts of the federal and state constitutions.

The takings clause of the Fifth Amendment states succinctly: "nor shall private property be taken for public use without just compensation." Article I, section 16, of the Washington State Constitution, on the other hand, provides more specificity:

> Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: *Provided*, That the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use.

The Park Owners contend that the state framers intended article I, section 16, to provide greater protection because it prohibits the State from "tak[ing] or damag-

[ing]" private property without just compensation, while the federal clause prohibits only the "tak[ing]" of private property. They argue that the greater detail set forth in the state clause further demonstrates this intent.

The State acknowledges the differences in the texts, but notes that the majority of these differences relate to procedures governing formal eminent domain proceedings, as opposed to substantive rights. For instance, article I, section 16, requires the State to pay compensation to the court on behalf of the property owner *before* initiating condemnation proceedings. The State further notes that the concept of a regulatory taking, like the one at issue here, first arose from an interpretation of the federal takings clause in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414-15, 43 S. Ct. 158, 67 L. Ed. 2d 322, 28 A.L.R. 1321 (1922), and postdates the adoption of the state constitution by over 30 years. Richard S. Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. PUGET SOUND L. REV. 339, 347 (1989).

We find the State's argument more compelling. These factors favor finding that the state constitution's protection against regulatory takings is coextensive with the Fifth Amendment provision.

### State Constitutional and Common-Law History

We next consider the third *Gunwall* factor, state constitutional and common-law history. The Park Owners contend that because the federal constitution predates the state constitution, the state drafters presumably knew the contents of the federal document and consciously chose to make a more detailed and comprehensive eminent domain provision.

The State, on the other hand, argues that in 1889, when the state constitution was adopted, citizens had little recourse for injuries to private property resulting from State action, *see Brown v. City of Seattle*, 5 Wash. 35, 38, 31 P. 313 (1893), and that the Fifth Amendment's takings clause

did not extend to the states until the Supreme Court's ruling in *Chicago, Burlington & Quincy R.R. v. City of Chicago*, 166 U.S. 226, 241, 17 S. Ct. 581, 586, 41 L. Ed. 979 (1897) (holding that the Fourteenth Amendment's due process clause makes federal takings clause applicable to states). Before the adoption of Washington's Constitution, most courts in states with constitutions that contained provisions identical to the federal takings clause narrowly interpreted the term "taking." *Brown*, 5 Wash. at 39. Accordingly, these states had to compensate property owners only for the physical occupation of their property, unless the claimant could prove that the government acted negligently or exceeded the its scope of authority. *Brown*, 5 Wash. at 39.

In response, Washington's state framers adopted a detailed eminent domain provision that guaranteed procedural due process rights and expanded the definition of a compensable loss to include damage to private property. *Brown*, 5 Wash. at 41. Again, the State emphasizes that this history suggests that the state framers intended to remedy physical encroachment or damage to property by the government, rather than address regulatory taking issues.

This factor also favors a finding that the state and federal provisions provide the same protection. Early Washington case law literally interprets taking or damaging property to involve physical occupation or degradation. As the United States Supreme Court has expanded the protections afforded by the federal takings clause, the distinction between taking and damaging property has become murky; the Washington State Supreme Court finally decided to "abandon[ ] the 'difficult and treacherous' distinction between" the two.[2] *Highline Sch. Dist. No. 401 v. Port of Se-*

---

[2]In *Highline Sch. Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 11, 548 P.2d 1085 (1976), the court observed that the abandonment of this distinction coincided with the recognition by state and federal courts that "ownership of property entails more than the right to exclusive possession, and includes the right to use the land." In *Martin v. Port of Seattle*, 64 Wn.2d 309, 317-18, 391

*attle*, 87 Wn.2d 6, 11, 548 P.2d 1085 (1976) (quoting *Martin v. Port of Seattle*, 64 Wn.2d 309, 313, 391 P.2d 540 (1964)).

### Preexisting State Law

The fourth *Gunwall* factor we consider is preexisting state law. In addressing this factor, the Park Owners rely heavily on *Brown*, 5 Wash. 35, which was authored by Justice Stiles, one of the drafters of the state constitution. In *Brown*, Justice Stiles observed that narrow interpretations of state constitutional provisions identical to the federal takings clause allowed government agents to take or damage private property without compensation as long as they were not negligent and acted within the scope of their authority. *Brown*, 5 Wash. at 39. He then described how states across the country remedied this situation by inserting provisions similar to article I, section 16, in their state constitutions. *Brown*, 5 Wash. at 40.

The State acknowledges this history. Once again, however, it observes that this case law does not support the notion that the protections of the state provision extended to regulatory takings, and, again, we find the State to have the better argument. The Park Owners have not offered any preexisting state law supporting its position that the article I, section 16, affords greater protections against regulatory takings.

### Differences in Structure Between the State and Federal Constitutions

The fifth *Gunwall* factor, structural differences between the federal and state constitutions, also favors a coextensive interpretation. Here, the Park Owners merely note that the United States Constitution *grants* limited authority to the federal government, while the state constitution *limits*

---

P.2d 540 (1964), the court observed, "[t]he specific purpose of the addition of language [in the State Constitution] beyond that of the United States Constitution is to avoid the distinctions attached to the word 'taking' appropriate to a bygone era."

the otherwise plenary power of the State. The State observes that a plain reading of article I, section 16, creates procedural limits on the State's exercise of eminent domain. It does not, however, contain any express limitation on the State's ability to enact and enforce legislation. Again, the State has the better argument.

Matters of Particular State Interest or Local Concern

The sixth and last *Gunwall* factor asks whether the clause deals with matters of particular state or local concern. The Park Owners limit their argument to the fact that Washington, like numerous other states at the time, adopted its takings provision to provide persons with a remedy not available under the then-current interpretation of the federal constitution. The State argues that later interpretations of the federal constitution have addressed the shortcomings the framers of the state constitution sought to correct. It also, once again, reminds us that the framers did not intend article I, section 16, to address regulatory takings.

The fact that numerous states adopted provisions similar to Washington's suggests that this issue was one of national, as opposed to local, importance. The later expanded interpretations of the federal constitution also suggest an issue of national import. Lacking any evidence that the framers adopted article I, section 16, to address issues unique to Washington State, this factor also supports a coextensive reading of the state and federal constitutions on the issue of regulatory takings.

■ Based on the arguments presented here, the *Gunwall* factors all favor a coextensive interpretation of the state and federal constitutions. Accordingly, we do not address the Park Owners' contentions that the Act is invalid under the heightened protection they assert the state constitution provides.

## II. STATE AND FEDERAL TAKINGS ANALYSIS

We now turn to the Park Owners' argument that the

Act is facially unconstitutional because its mere enactment destroys or derogates the fundamental property rights of all owners of mobile home parks in Washington State. *See Guimont v. Clarke*, 121 Wn.2d 586, 605, 854 P.2d 1 (1993).

■ ■ When analyzing a facial takings challenge, this court first must determine, as a threshold question, whether the regulation infringes upon a fundamental attribute of ownership so as to constitute a "total taking." *Guimont*, 121 Wn.2d at 598-600. The fundamental attributes include "the right to possess, to exclude others, or to dispose of property" and "the right to make *some* economically viable use of the property." *Guimont*, 121 Wn.2d at 602. The plaintiff may demonstrate this by showing that the mere passage of the regulation either (1) deprives landowners of all economic use of the regulated property or that it (2) results in the physical invasion of the regulated property. *Guimont*, 121 Wn.2d at 599.

The Park Owners contend that the Act's provision granting tenants a right of first refusal destroys or is in derogation of the following attributes of property ownership, which they characterize as fundamental: (1) the right to sell the property; (2) the right to exclude others; and (3) the right to close a sale immediately. The Park Owners also suggest that the Act allows for a physical invasion by the new owner after the sale, but they do not claim that the Act deprives them of all economic use of their parks.

An owner of property subject to a regulation that constitutes a physical invasion or a total taking is entitled to relief regardless of the public interest reasons supporting the regulation unless the State provides rebuttal evidence showing that the use violates nuisance or property laws. *Guimont*, 121 Wn.2d at 598; *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017-19, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992). The State describes the right at issue as a right of first refusal, which is not a fundamental property right in the state of Washington:

> In Washington no interest in land is created by a right of first refusal; only personal rights are affected. *Robroy Land*

*Co. v. Prather*, 95 Wn.2d 66, 70-71, 622 P.2d 367 (1980); *Feider v. Feider*, 40 Wn. App. 589, 593, 699 P.2d 801 (1985). In *Robroy Land Co.*, at 71, the court stated: "We reject the view that a preemptive contract . . . creates an interest in land *at the time of its inception.*" A preemptioner acquires no present right to affect the property, but holds only a general contract right to acquire a later interest should the property owner decide to sell. In that event, a new contract ensues under which the preemptive holder may receive an interest in land. *Robroy Land Co.*, at 71; *see Northwest Television Club, Inc. v. Gross Seattle, Inc.*, 96 Wn.2d 973, 980, 640 P.2d 710 (1981); *Bennett Veneer Factors, Inc. v. Brewer*, 73 Wn.2d 849, 853-54, 441 P.2d 128 (1968); *Feider*, 40 Wn. App. at 593, 699 P.2d 801.

*Old Nat'l Bank v. Arneson*, 54 Wn. App. 717, 721-22, 776 P.2d 145 (1989).

In adopting this rule, the Washington State Supreme Court quoted with approval the following commentary from the RESTATEMENT OF PROPERTY:

The interference with alienation present in a requirement that a designated person be afforded a reasonable opportunity to meet any offer received from a third party by an owner desirous of selling is so slight that the major policies furthered by freedom of alienation are not infringed to a degree which requires invalidation. Under these circumstances, the owner has two potential buyers at the same price and is assured of a reasonably prompt culmination of the sale. Such restraints are, therefore, valid.

4 RESTATEMENT OF PROPERTY, § 413(1) cmt. c, at 2443 (1944) (quoted in *Robroy Land Co. v. Prather*, 95 Wn.2d 66, 70, 622 P.2d 367 (1980)). Applying similar reasoning, numerous courts have concluded that a right of first refusal is not an interest in land and, therefore, not compensable in eminent domain or inverse condemnation proceedings. *See Minnesota by Alexander v. Block*, 660 F.2d 1240, 1256 (8th Cir. 1981) (statute granting federal government right of first refusal not a taking even if some diminution in value results), *cert. denied*, 455 U.S. 1007 (1982); *Kaiser Dev. Co. v. City & County of Honolulu*, 649 F. Supp. 926,

937 (D. Haw. 1986) (right of first refusal not a compensable interest in regulatory taking challenge); *City of Ashland v. Kittle*, 347 S.W.2d 522, 524 (Ky. 1961) (right of first refusal not compensable in eminent domain proceeding); *Greenfield Country Estates Tenants Ass'n, Inc. v. Deep*, 423 Mass. 81, 666 N.E.2d 988, 992 (1996) (legislation granting tenants right of first refusal to buy mobile home park does not constitute unconstitutional inverse condemnation).

The Park Owners argue that the tenants' right of first refusal is analogous to an option contract. Citing *Spokane Sch. Dist. No. 81 v. Parzybok*, 96 Wn.2d 95, 633 P.2d 1324 (1981), they contend that the unexercised option encumbers the property and clouds the title.

In *Parzybok*, the court held that principles of "equity and fairness" allow compensation for a resident leaseholder who, during eminent domain proceedings, lost an option to buy premises at a specific price. 96 Wn.2d at 103. The *Parzybok* court provided that its ruling should be applied only after "examining the circumstances and the relation of the parties, rather than by mere resort to common law concepts of 'title.' " 96 Wn.2d 103-04. Finding it highly likely that the optionee would have exercised the option but for the condemnation proceedings, the court held that it was equitable for him to recover the difference between the option contract price and the condemnation price. *Parzybok*, 96 Wn.2d at 104.

*Parzybok* is distinguishable. First, the preemptive right created by the Act is not comparable to the option contract at issue in *Parzybok*. The former entitles the tenants to purchase only when and if the owner chooses to sell and at the price and under the conditions the owner would demand if selling the property to a third party. But an option holder can compel a sale at a stipulated price. *Robroy*, 95 Wn.2d at 72. Second, *Parzybok* provides that a court must conduct a fact-specific inquiry when determining whether an option contract is compensable. As the Park Owners present a facial challenge, there are no facts for this court to evaluate.

In support of its assertion that the Act places a cloud on the title of mobile home park property, the Park Owners provided letters from various real estate professionals. But, as the Court stated in *Andrus v. Allard*, 444 U.S. 51, 66, 100 S. Ct. 318, 327, 62 L. Ed. 2d 210 (1979), "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." Although the owners clearly have raised an issue as to the impact of the Act on their property values and its ease of disposition, the issue is not material in light of the legal test involved in a facial takings challenge.

Because the right of first refusal is not a property interest, the Act's provisions limiting the sale of this right do not constitute an unconstitutional taking of private property. Further, even assuming that the Act's provisions touched on a "fundamental attribute of ownership," at most the Act would constitute a partial, not a total, taking. Thus, Park Owners are not entitled to "categorical" relief "without case-specific inquiry into the public interest advanced in support of the regulation." *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 644, 854 P.2d 23 (1993) (citing *Lucas*, 505 U.S. 1017-19).

Because the issue here arguably involves a partial taking, we consider the second threshold question posed by the *Margola* court: Does the Act "merely protect[ ] the public interest in health, safety, the environment or the fiscal integrity of an area, or [does it] 'seek[ ] less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit'." 121 Wn.2d at 645 (quoting *Robinson v. City of Seattle*, 119 Wn. 2d 34, 49, 830 P.2d 318 (1992)).

Here, the Act does not seek to prevent "some real harm to the public which is directly caused by the prohibited use of the property[; it] instead imposes on those regulated the requirement of providing an affirmative public benefit . . . ." *Margola*, 121 Wn.2d at 645. It does so by imposing on the Park Owners the requirement that they first offer their properties to their tenants.

Consequently, *Margola* and *Guimont* direct us to perform a takings analysis. *Margola*, 121 Wn.2d at 645; *Guimont*, 121 Wn.2d at 603-04. This requires a consideration of whether the regulation "substantially advances a legitimate state interest." *Margola*, 121 Wn.2d at 645; *Guimont*, 121 Wn.2d at 604. If it does, the court then must "balance this state interest against the regulation's adverse economic impact on the landowner . . . ." *Margola*, 121 Wn.2d at 646.

▮▮▮▮ The Legislature defined the Act's purpose in RCW 59.23.005, which states:

> The legislature finds that mobile home parks provide a significant source of homeownership for many Washington residents, but increasing rents and low vacancy rates, as well as the pressure to convert mobile home parks to other uses, increasingly make mobile home park living insecure for mobile home owners. The legislature also finds that many homeowners who reside in mobile home parks are also those residents most in need of reasonable security in the siting of their manufactured homes. It is the intent of the legislature to encourage and facilitate the conversion of mobile home parks to resident ownership in the event of a voluntary sale of the park.

The Legislature has broad powers to enact reasonable laws unless restrained by the state or federal constitution. *Pacific Am. Realty Trust v. Lonctot*, 62 Wn.2d 91, 95, 381 P.2d 123 (1963). The Legislature's interest in assuring suitable housing for its residents appears reasonable and the Park Owners provide no argument that this interest is not legitimate. We conclude our inquiry at this point because the Park Owners have provided no evidence as to the Act's economic impact. Thus, there is no basis to conclude that adverse impacts on the Park Owners outweigh the State's interest.

The Park Owners also contend that the Act constitutes a taking by physical invasion, apparently arguing that they will be unable to remove the tenants if the tenants exercise their right to purchase. But this argument ignores the fact

that, if and when the tenants purchase the park, the Park Owners would no longer have any ownership rights to lose. Thus, this argument is not persuasive.

## Other Jurisdictions

The Park Owners urge this court to follow *Gregory v. City of San Juan Capistrano*, 142 Cal. App. 3d 72, 88-90, 191 Cal. Rptr. 47 (1983), in which a California appellate court struck down an ordinance similar to the one at issue here as facially unconstitutional because it impinged upon a property owner's fundamental right to sell his property to whomever he chooses. The *Gregory* court concluded that a preemptive right constituted a fundamental property right, 142 Cal. App. 3d at 88, analogizing the loss of this right to the physical invasion of property found to be a total taking by the Supreme Court in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982); *Gregory*, 142 Cal. App. 3d at 90. The *Gregory* court found that the purpose for the ordinance —to afford "mobile home residents a measure of control over their own living situations"—was "entirely insufficient to legitimate the uncompensated appropriation of significant private property rights." 142 Cal. App. 3d at 89; *but see Forty-Niner Truck Plaza, Inc. v. Union Oil Co.*, 58 Cal. App. 4th 1261, 1271-72, 68 Cal. Rptr. 2d 532 (1997) (distinguishing *Gregory* and holding that statute giving operator right of first refusal to purchase franchise did not constitute unconstitutional taking because public interest served by statute outweighed minimal infringement of franchise owners' property rights).

But under Washington law, as we discussed above, the Act does not destroy or derogate a fundamental property right. Further, we note that recently the Massachusetts Supreme Court rejected a facial takings challenge to legislation almost identical to RCW 59.23. *Greenfield*, 666 N.E.2d 988. The *Greenfield* court concluded that (1) granting park tenants the right of first refusal constitutes a de minimis intrusion on the owner's property rights, (2) the law

substantially advances a legitimate public interest in stabilizing a declining but valuable housing resource and helping preserve affordable housing, and (3) the law does not deny the owner all economically viable use of the land. 666 N.E.2d at 992.

Like Massachusetts, Washington courts have found that a right of first refusal minimally intrudes on the exercise of fundamental property rights. The Washington Legislature has also concluded, like the Massachusetts Legislature, that the public benefited from the Act because it slowed the loss of available mobile home sites and preserved a source of affordable housing for the state's residents. RCW 59.23.005. Given the parallels between the Massachusetts's law and Washington's law, the analysis in *Greenfield* is persuasive.

We affirm.

MORGAN and ARMSTRONG, JJ., concur.

Reconsideration denied April 7, 1998.