163 Cal.App.3d 1 (1984)
210 Cal. Rptr. 165
ADAMSON COMPANIES, Plaintiff and Respondent,
v.
STEVEN ZIPP et al., Defendants and Appellants.
Docket No. 15963.
Court of Appeals of California, Appellate Department, Superior Court, Los Angeles.
November 15, 1984.
*4 COUNSEL
Allred, Maroko, Goldberg & Ribakoff and Nathan Goldberg for Defendants and Appellants.
Kunath & Talley and Linda J. Lester for Plaintiff and Respondent.
*5 OPINION
SHABO, J.
On this appeal by defendants in an unlawful detainer action from a judgment, rendered after a trial to the court, we are asked to address issues of first impression arising out of the Mobilehome Residency Law (Civ. Code, § 798 et seq.), and the Mobilehome Parks Act (Health & Saf. Code, § 18200 et seq.). In particular, we are called upon to decide whether omission strictly to comply with the notice to "legal" and "registered" owner procedure established by section 798.55, subdivision (b) of the Civil Code defeats the landlord's right to maintain an unlawful detainer action under the Mobilehome Residency Law. We also resolve the issue whether the "adults only" restrictions of a mobilehome lease, incorporating the mobilehome park's written rules and regulations, may lawfully serve as a basis for a mobilehome tenant's eviction in light of certain provisions of the Mobilehome Residency Law, the Mobilehome Parks Act and the Unruh Civil Rights Act (Civ. Code, §§ 51, 53) as well as federal and state constitutional guarantees of equal protection, due process and privacy. (U.S. Const., Amend. XIV; Cal. Const., art. I, §§ 1, 7, and 13.)
For reasons which we shall explain, we hold that the notice to the nontenant-owner provision of Civil Code section 798.55, subdivision (b), in contradistinction to the notice-to-tenant provisions of the Unlawful Detainer Act (Code Civ. Proc., §§ 1161-1179), is not jurisdictional. We also decide that the "adults only" restriction violates the provisions of the Unruh Civil Rights Act (Civ. Code, §§ 51, 53) and therefore cannot serve as a valid basis for termination of the lease. Because of our latter holding, it will be unnecessary for us to decide the federal and constitutional questions.

FACTS[1]

A. The Zipps, the Park and the Lease

Defendant Steven Zipp purchased a mobilehome in place at Point Dume Mobile Home Park on September 1, 1978. At the time that he purchased *6 the mobilehome and entered into the lease,[2] Mr. Zipp was single and did not have any expectation of starting a family.
Paragraph 9(a) of the lease provided: "Lessee shall not use or permit the space, or any part thereof, to be used for any purpose other than as a residence for the Lessee and members of his immediate family, which includes the Lessee, his or her spouse, and his or her adult children."
The park rules and regulations provided in subparagraph 2 of paragraph C: "This is an adult park and children visitors must be controlled and must remain on the space they are visiting unless accompanied by an adult tenant. No skates or skateboards allowed."
Mr. Zipp later executed an addendum to the lease that provided as follows: "Lessees acknowledge that they know the park is limited to adults only, and agree that should Barbara Rosenthal become pregnant, lessee agrees to vacate the space and leave the park, prior to the birth of said child, to insure that other mobilehome owners and residents can enjoy the park and not be deprived of their right to enjoy their property, due to birth of said child. [¶] Should lessees fail to comply with this paragraph, they agree to pay any cost or attorney fees which may be incurred by Lessor to remove them from the park due to birth of said child."
On July 21, 1980, Mr. Zipp married defendant Barbara Rosenthal Zipp.[3] They had a child, Shifra, who was born on December 2, 1980. No evidence suggests that she engaged in poor deportment or constituted an actual annoyance while living in the park.
At the time of trial Mr. Zipp was living in the mobilehome with his wife and baby. His mobilehome was approximately 25 feet (window-to-window) from his nearest neighbor.
Point Dume was a mobilehome park with spaces designed to accommodate mobilehomes. The park was constructed and operated pursuant to the *7 terms of a conditional use permit issued by the County of Los Angeles after public hearings in 1968.
The conditional use permit provided that the park be restricted to persons over 16 years of age and that if any provision of the permit should be declared invalid, the permit "shall be void and privileges granted hereunder shall lapse."
In addition to the age limitation contained within the conditional use permit, the park had since its opening adhered to its own policy of limiting residential occupancy of those permanently residing in the park to those 18 years of age or over. This policy was set forth in Point Dume's written rules and regulations which were in effect at the time that the lease agreement between plaintiff and defendant was executed; these rules and regulations were provided to defendant Steven Zipp together with the lease.[4]
Apparently the park lacked paved walkways. Some of the residences, including that of the defendants, had yards. The park had a club house and a swimming pool on the grounds. However, the pool had no shallow end for young children.[5],[6],[7]
The Point Dume leases recited as an assumption that occupancy would generally be limited to two persons per unit, unlike a "family park," where *8 the potential number of occupants is calculated on an assumption of four persons per home. Occupancy of any space was limited by the lease to the tenant and his or her spouse and his or her "adult" children. Under the lease and the park rules children could visit in a residence for up to two weeks in any calendar month and could otherwise generally visit at will.[8]

B. The Facts Relating to Notice to the Nontenant Owners

On July 2, 1981, plaintiff filed a complaint against defendants for unlawful detainer. Plaintiff alleged that defendants had breached the lease agreement in permitting their child to reside in the mobilehome park; that on April 1, 1981, the Los Angeles County Marshal had served upon defendants by constructive service a seven-day written notice of this violation but that the violation had not been cured; that the marshal had constructively served them on April 17, 1981, with a written notice to terminate possession; that more than sixty days had elapsed since the service of this notice upon the defendants; that possession of the premises had not been surrendered by defendants, who were continuing to remain in possession. The complaint also prayed for attorney fees on the basis of Civil Code section 798.85 and of the lease agreements.
In their answer defendants, denying the liability of Barbara Zipp, admitted that Steven Zipp had entered into the lease and that he continued to reside on the leased premises with his wife and child as alleged in the complaint. As affirmative defenses, defendants claimed that the unlawful detainer action, based "on nothing more than the residency of a minor child in their mobile home," constituted illegal discrimination prohibited under the Unruh Civil Rights Act, was unconstitutional as a violation of defendants' rights to equal protection and to due process of law under the United States and California Constitutions, and that the age limitation set forth in the lease agreement was "void as contrary to public policy." Defendants also sought a stay of the unlawful detainer proceedings pending decision in Marina Point, Ltd. v. Wolfson, then pending argument before the California Supreme Court.[9]
Pending hearing on plaintiff's motion for summary judgment, defendants filed an amended answer in which as an additional affirmative defense they *9 asserted plaintiff's failure to comply with the notice provisions of former section 798.55, subdivision (b) of the Civil Code (amended in 1982 and 1983 [see p. Supp. 10 and fn. 10, post]). On this issue the evidence at trial established that plaintiff had properly served the Zipps with the required notices but that plaintiff had delayed by one week in furnishing notice to the legal and registered owners of the Zipps' mobilehome because plaintiff failed to ascertain their identity, as required by statute, and had relied upon a statement in Steven Zipp's rental application, in which he claimed that the mobilehome was owned by "Steven Zipp and Company." Defendants conceded that the unlawful detainer was not filed until 73 days after the legal and registered owners had been served with notice.
The municipal court initially denied the motion for summary judgment but upheld defendants' claim that the notice defect barred plaintiff's recovery; therefore the court granted judgment in favor of defendants together with costs and attorney fees upon submission of a memorandum of costs. Upon plaintiff's motion for reconsideration, the court below set aside the judgment.
From the evidence the trial court found as a factual matter that, contrary to the procedure established by former section 798.55, subdivision (b), notice to the legal and registered owners had not been mailed on the same day that notice had been given to the defendant tenants. However, the court determined the landlord believed that he was in fact serving the legal and registered owner of the home based upon the information provided in the rental application. Although concluding that the plaintiff's reliance upon the statement made in the rental application was not justifiable in light of the statutory mandate for ascertaining the mobilehome's ownership, nonetheless the court held that there had been "substantial compliance" with the statute and that any defect in service of the legal and registered owners was non-prejudicial.

I.

Compliance With Former Civil Code Section 798.55, Subdivision (b)'s Notice Requirements With Respect to the Nontenant "Legal Owner" and "Registered Owner" Is Not a Jurisdictional Prerequisite to Maintenance of an Unlawful Detainer Under the Mobilehome Residency Law.
(1a) Our analysis of the Mobilehome Residency Law's notice to nontenant procedure of former Civil Code section 798.55, subdivision (b) places us in accord with the trial court. We hold that under the facts at bench plaintiff's failure fully to comply with former section 798.55, subdivision (b) does not defeat his right to maintain the unlawful detainer action and *10 that, as observed by the trial court, because proper notice to the nontenant owner could be accomplished by reservice of notice, "to hinge a plaintiff's entire right to proceed on the making of such a totally duplicative, redundant notice, and [that] to interpret [former] section 798.55, subdivision (b) as requiring such wasteful conduct as an essential prerequisite to a right of action would be to elevate form over substance and to require the performance of a useless act, which is something that the law will never do." Our holding is based upon comparison of the Mobilehome Residency Law with the unlawful detainer sections contained in the Code of Civil Procedure, and by what we perceive to be the dominant purpose of requiring such notice.
Prior to its amendment in 1982 and 1983,[10] subdivision (b) of former section 798.55 read as follows: "(b) The management shall not terminate or refuse to renew a tenancy, except for a reason specified in this article and upon the giving of written notice to the tenant in the manner prescribed by Section 1162 of the Code of Civil Procedure, to remove the mobilehome from the park within a period of not less than 60 days, which period shall be specified in the notice. A copy of this notice shall be sent to the legal owner and registered owner of the mobilehome, if other than the tenant, by United States mail on the same day as notice is given to the tenant, addressed to the legal and registered owners at their addresses, as set forth in the registration card specified in Section 18075.28 of the Health and Safety *11 Code." Our research has disclosed no case construing the foregoing section as it read prior to the 1983 amendment in terms of the question whether strict compliance with its notice provisions in regard to the "legal owner and registered owner of a mobilehome, if other than the tenant," constitutes a jurisdictional prerequisite to the mobilehome park landlord's right to maintain an unlawful detainer action. In the absence of controlling authority on this point, we believe that logic and the policy underlying the notice-to-the-nontenant-owner provision of section 798.55, subdivision (b) require the conclusion that the Legislature did not intend, nor does the law otherwise require, strict adherence to this aspect of the notice procedure so long as the owner, if other than the tenant, prior to the filing of the action, does receive fair notice of the termination or refusal to renew a tenancy under the Mobilehome Residency Law. (See Arrieta v. Mahon (1982) 31 Cal.3d 381, 389-393 [182 Cal. Rptr. 770, 644 P.2d 1249]; Adams v. Department of Motor Vehicles (1974) 11 Cal.3d 146 [113 Cal. Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803]; see also, People v. Surety Insurance Co. (1978) 82 Cal. App.3d 229, 237-239 [147 Cal. Rptr. 65].)[11]
(2) In reaching this conclusion, we recognize that the remedy of unlawful detainer established by the Code of Civil Procedure (§§ 1161-1179) generally requires absolute compliance with the statutory notice requirements. (See, e.g., Briggs v. Electronic Memories & Magnetics Corp. (1975) 53 Cal. App.3d 900, 905 [126 Cal. Rptr. 34]; Davidson v. Quinn (1982) 138 Cal. App.3d Supp. 9, 11-12 [188 Cal. Rptr. 421].) Because the essential purpose of the Code of Civil Procedure's unlawful detainer provisions is to enable a landlord expeditiously and summarily to regain possession of real property wrongfully withheld by a tenant, the courts have insisted upon strict compliance. (Davidson v. Quinn, supra, 138 Cal. App.3d Supp. at p. 11; see Briggs v. Electronic Memories & Magnetics Corp., supra, 53 Cal. App.3d at p. 906 and fn. 5; see also, Fifth & Broadway Partnership v. Kimny, Inc. (1980) 102 Cal. App.3d 195, 202 [162 Cal. Rptr. 271, 7 A.L.R.4th 580].)
(3a) In contrast, the provisions of the Mobilehome Residency Law establish beyond question that the Legislature intended to provide a less summary procedure for eviction of mobilehome tenants. Section 798.55, subdivision *12 (a)[12] contains a legislative declaration recognizing the necessity that owners of mobilehomes occupied within mobilehome parks be provided with "unique protection from actual or constructive eviction." (See Gregory v. City of San Juan Capistrano (1983) 142 Cal. App.3d 72, 81-82 [191 Cal. Rptr. 47].) Despite subsequent amendments to subdivision (b) (see fn. 10, ante, and accompanying text), the Legislature has left unmodified the language of subdivision (a).
To accomplish its purpose the Legislature significantly limited the termination rights of mobilehome park landlords to evict by requiring 60 days notice to the tenant.[13] (Civ. Code, § 798.55, subd. (b); see Palmer v. Agee (1978) 87 Cal. App.3d 377 [150 Cal. Rptr. 841].) The Legislature also restricted the reasons for termination to those specified in former Civil Code section 798.56.[14] (Civ. Code, § 798.55, subd. (b).) The subsequent amendments *13 are not material to the issue before us. Finally, Civil Code section 798.57 circumscribes the landlord's power to terminate by specific procedural requirements relating to notice. Thus, the section provides: "The management shall set forth in a notice of termination, the reason relied upon for the termination with specific facts to permit determination of the date, place, witnesses, and circumstances concerning that reason. Neither reference to the section number or a subdivision thereof, nor a recital of the language of this article will constitute compliance with this section."
In contrast to the Mobilehome Residency Law, the Code of Civil Procedure's provisions in respect to unlawful detainer actions do not so narrowly restrict the landlord's power to evict: The Code of Civil Procedure requires no waiting period before commencing the action after the giving of proper notice and the expiration of the applicable statutory waiting periods. The notice need not specify the reason for termination with specific facts. Nor does subdivision 3 of Code of Civil Procedure section 1161 expressly require that the lease's breached condition or covenant be "reasonable."[15]
In construing predecessor notice sections of the Mobilehome Residency Law in comparison to the Code of Civil Procedure's notice provisions relating to unlawful detainers, the Court of Appeal concluded in Palmer v. Agee (1978) 87 Cal. App.3d 377 [150 Cal. Rptr. 841] that the two schemes were irreconcilable for notice purposes and that the notice provisions of the former controlled the general provisions of the latter. (87 Cal. App.3d at p. 386.) Our own comparative analysis of these two statutory schemes leads *14 us to the same conclusion. (See Civ. Code, § 798.60.)[16] (4) (See fn. 17.) In order to ascertain legislative intent, we consider pertinent legislative history of which we take judicial notice. (Evid. Code, §§ 459, subd. (a)(2), 452, subd. (c).)[17] (3b) These documents conclusively demonstrate that the Legislature's predominant concern in providing such notice was to enhance the availability of financing of mobilehome purchasers and to protect the property interest of the owner by guaranteeing notice of the termination of the mobilehome tenancy and the forthcoming removal from the park of the mobilehome. In this connection, it was observed in the enrolled bill report of the Business and Transportation Agency with respect to Assembly Bill No. 2915, which was enacted in 1980 and contains the notice provision before us, that: "Various notices and security provisions have been developed with the lending industry to make mobilehomes more desirable collateral despite their mobility. These include notice of the moving of a mobilehome or of delinquency in park rent by a tenant other than the registered or legal owner." The Agency's report further noted at page 3: "This bill ... improves on [existing law] in many respects, particularly regarding the flexibility and attractiveness of mobile home financing.... This bill was developed through extensive consultation with many industry and interest group representatives, and stand as a broad consensus on what will benefit housing consumers, the mobilehome industry, the lending industry, and California's housing situation in general." The report of the Assembly Committee on Housing and Community Development with regard to Assembly Bill No. 2915's provisions permitting mobilehomes to be installed on foundations described the provision as requiring mobilehome owners "to discharge upon installation any obligation creating a security interest or other encumbrance on the mobilehome to be installed." (Id., at p. 3.) To similar effect are other legislative analyses of Assembly Bill No. 2915, including the report of the Senate Committee on Local Government at pages 3-4 and the third reading analysis by the Senate Democratic Caucus at pages 1-2. The 1983 amendments to section 798.55, subdivision (b) of the Civil Code constitute further evidence supportive for our view.[18]
*15 The foregoing provides overwhelming evidence that the Legislature's purpose in providing nontenant notice under section 798.55, subdivision (b) was to protect the security and ownership interests of the nontenant owner. This provision bears no relationship to the essential purpose of mobilehome park eviction proceedings, which is to return possession of the leased site to the landlord. The nontenant entitled to notice has no possessory interest in the site upon which the mobilehome is situated. Therefore, a landlord's failure fully to satisfy the notice procedure as to them under former section 798.55, subdivision (b) cannot result in the forfeiture of their security or property interest. For, apart from the latter's right to cure a default in payment of rent or other charges under section 798.56, subdivision (d),[19] the nontenant owner enjoys no right to cure other nonpayment-related breaches by the tenant. (Civ. Code, § 798.56, subdivision (c).) Moreover, the tenant at best has only the most speculative benefit from notice to the nontenant: The tenant cannot compel such person to cure even a payment default under section 798.56, subdivision (d).[20] For these reasons we question, though we need not decide, whether a tenant has standing to raise as an affirmative defense in an unlawful detainer proceeding arising under the Mobilehome Residency Law the issue of defective notice to the nontenant.
(1b) Because we perceive no danger to the latter of forfeiture in the case of noncompliance with section 798.55, subdivision (b)'s nontenant notice procedure and because the legislative purpose of effecting such notice is not promoted by requiring strict compliance insofar as nontenant owners are concerned, we hold that substantial compliance, which assures fair notice to the nontenant owner, is all that is required.
In light of our conclusion, we believe that under the facts at bench plaintiff's giving of actual notice to the legal and registered owners in excess of the 60-day notice requirement of section 798.55, subdivision (b) before initiating the unlawful detainer action sufficiently satisfied the section. By furnishing such notice, plaintiff fulfilled the legislative purpose of protecting the security and ownership interests of the owners by notifying them of the impending removal of the mobilehome. Moreover, neither the defendants nor the owners suffered any prejudice by plaintiff's error.

*16 II.

The Unruh Civil Rights Act Applies to Mobilehome Park Tenancies.
(5a) Plaintiff contends that its "adults only" restriction violates neither the Unruh Civil Rights Act nor any constitutional provision relied upon by defendants, and that its restriction constitutes a reasonable rule or regulation, within the meaning of Civil Code section 798.56, subdivision (c), justifying termination of the lease. In particular, plaintiff argues that in enacting Civil Code section 798.76 and Health and Safety Code section 18300, subdivision (g)(1),[21] the Legislature exempted age restrictions in mobilehome park leases from the operation of the Unruh Civil Rights Act.[22] Moreover, plaintiffs urge that the statutory authorization for its "adults only" policy is constitutionally valid. Fundamentally plaintiff invites us to *17 conclude from the enactment of Civil Code section 798.76 and Health and Safety Code section 18300, subdivision (g)(1) (see fn. 21, ante) that the Legislature repealed by implication the Unruh Civil Rights Act insofar as plaintiff's age restriction is concerned. However, well-settled rules of statutory construction, the legislative purposes underlying enactment of the Unruh Civil Rights Act, the Mobilehome Parks Act and the Mobilehome Residency Law, and the reality of the shortage in California of shelter for families with children compel us to reject plaintiff's invitation.[23]
(6), (7) We begin our analysis with the elementary rules that courts are required to construe statutory provisions in harmony in order to effectuate them whenever possible; there exists a presumption against repeals by implication. (In re Thierry S. (1977) 19 Cal.3d 727, 744 [139 Cal. Rptr. 708, 566 P.2d 610].) (8) Only in the case of an irreconcilable conflict among statutory provisions dealing with the same subject and where no rational basis exists for harmonizing potentially conflicting statutes may a court properly determine that a specific provision governs over a more general, conflicting one. For repeals by implication are disfavored. They exist only by express declaration of legislative intent or by necessary implication. (In re Thierry S., supra; Fuentes v. Workers' Comp. Appeals Bd. (1976) 16 Cal.3d 1, 7 [128 Cal. Rptr. 673, 547 P.2d 449]; see also, Palmer v. Agee, supra, 87 Cal. App.3d 377, 383.) (9) Finally, we must assume that in enacting a statute the Legislature is aware of existing related law and intends to maintain a consistent body of rules. (Fuentes v. Workers' Comp. Appeals Bd., supra, 16 Cal.3d 1.) These rules require us to determine whether the Unruh Civil Rights Act, the Mobilehome Parks Act, and the Mobilehome Residency Law deal with the same subject insofar as age restrictions in mobilehome park tenancies are concerned. In this determination the purposes and legislative objectives sought to be achieved are significant factors. (Cal. Drive-in Restaurant Assn. v. Clark (1943) 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].)
*18 (5b) For reasons which we shall explain, our analysis of these statutory provisions compels the conclusion that they do not deal with the same subject, that they are not conflicting, and that therefore the Legislature did not intend to repeal the Unruh Civil Rights Act in relation to age restrictions in mobilehome park tenancies.
(10) Addressing first the question of subject, it is well established that the Unruh Civil Rights Act was enacted to protect the personal right of all persons in California to equality of access to goods and services furnished by business enterprises in this state. The act was thus intended to prohibit business from engaging in arbitrary discrimination. (Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721, 730-732; In re Cox, supra, 3 Cal.3d 205, 216; see also, O'Connor v. Village Green Owners Assn., supra, 33 Cal.3d 790, 793-794.) In this regard, the Unruh Civil Rights Act has been held to prohibit apartment-house landlords (Marina Point, Ltd. v. Wolfson, supra; Hubert v. Williams, supra, 133 Cal. App.3d Supp. 1) and condominium associations from arbitrarily refusing to rent to families with children. (O'Connor v. Village Green Owners Assn., supra, 33 Cal.3d 790.)
Our Supreme Court has historically afforded an expansive application to the Unruh Act, holding that "the `identification of particular bases of discrimination  color, race, religion, ancestry and national origin  ... is illustrative rather than restrictive.'" (Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721, 732.) The court has declared to this end that the act possesses "a clear and large design to interdict all arbitrary discrimination by a business enterprise." (In re Cox, supra, 3 Cal.3d 205 at p. 212; see also, Marina Point, Ltd. v. Wolfson, supra, at p. 733.) Moreover, the court's broad application of the act has received consistent legislative approval. (See Marina Point, Ltd. v. Wolfson, supra, at p. 734.) In light of this history we may not presume that the Legislature in enacting the mobilehome statutes before us intended to overthrow long established principles of law in the absence of clear and persuasive evidence by way of express legislative declaration or by necessary implication. (Fuentes v. Workers' Comp. Appeals Bd., supra, 16 Cal.3d at 7.) Plaintiff has adduced no such evidence.
(5c) In contrast to the broad concern with equality of treatment expressed in the Unruh Civil Rights Act and its case law application, the Mobilehome Parks Act and the Mobilehome Residency Law were enacted in the late 1970's in order to deal with the specific and critical problem of housing in California. These statutory provisions represented a legislative effort to develop a statewide housing plan to accommodate an expected population in California of 24.4 million people by 1985 and to address the critical shortage of shelter faced by Californians when these statutes were enacted. (Note, Marina Point, Ltd. v. Wolfson: A Victory For Children In *19 Rental Housing  Implications For Further Expansion Of The Unruh Civil Rights Act (1983) 13 Golden Gate L.Rev. 697, 699-701.) As part of its comprehensive plan, the Legislature centralized in state government the power to regulate and enforce standards in the development and operation of mobilehome parks by enacting the Mobilehome Parks Act. (Health & Saf. Code, §§ 18200-18700; see Gregory v. City of San Juan Capistrano, supra, 142 Cal. App.3d 72, 85.) Furthermore, the Legislature attempted to encourage, by making mobilehomes subject to the real property tax, the establishment of mobilehome parks through the issuance of use permits by local government. (Analysis of Assembly Bill No. 2915 by Assembly Committee on Housing and Community Development, p. 1.) In addition, as we noted in part I, that body sought to enhance the availability of financing for the purchase of mobilehomes. Finally, with the enactment of the Mobilehome Residency Law, the Legislature evidenced its fundamental purpose to enhance the security and stability of mobilehome tenants. To accomplish this goal the law substantially restricted the landlord's right to evict a mobilehome-park tenant. (See fns. 10 and 12, ante, and accompanying text; Gregory v. City of San Juan Capistrano, supra, at pp. 81-82.) As the Court of Appeal observed, the Mobilehome Residency Law was enacted "to make it very clear that mobile home tenancies are different from the ordinary tenancy and that landlord-tenant relations involving mobile homes are to be treated differently...." (Palmer v. Agee, supra, 87 Cal. App.3d at p. 384.) Indeed, except for the ban on discrimination contained in Civil Code section 798.20,[24] which prohibits racial, religious, sex, national origin, ancestral or marital status discrimination where membership in a private club or organization is a condition for tenancy in a mobilehome park, neither the Mobilehome Residency Law nor the Mobilehome Parks Act contains any provision designed to protect the personal right to equality of access to shelter which, as we have previously observed, is a subject governed by the Unruh Civil Rights Act.
(11) In Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721 at pages 742-743, the Supreme Court ascribed to the "adult only" restrictions authorized by the Legislature with reference to mobilehome parks the legislative purpose of providing retirement communities or housing complexes especially reserved for older citizens in order to meet the special housing needs of the elderly. The correctness of this conclusion is reflected in the fact that in 1978, when enacting Civil Code section 798.76 and Health and *20 Safety Code section 18300, subdivision (g)(1),[25] the Legislature created a demonstration project to provide mobilehome-park residencies for the elderly. Such residencies were to be made available through state financing. (See Health & Saf. Code, §§ 50540-50547; Cal. Admin. Code, tit. 25, § 6910 et seq.)
From the foregoing, we believe that the Legislature's purpose in authorizing "adults only" restrictions was to implement the provisions of Health and Safety Code sections 50540-50547, permitting occupancy by the elderly of mobilehome residencies under the demonstration project. Further evidence supporting our conclusion lies in the fact that in the years since Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721, was decided, the Legislature has not supplied a statutory definition of either the terms "adults only" or "adult mobile home park" different from the Supreme Court's explanation of those terms in Marina Point, Ltd., v. Wolfson, supra, 30 Cal.3d 721.[26] We therefore conclude that the Legislature has manifested its approval of the Supreme Court's observation of the intended purpose underlying the statutes authorizing the imposition of age restrictions in mobilehome tenancies. (See Marina Point, Ltd. v. Wolfson, supra, at p. 734.)
On the basis of our statutory analysis we conclude that the Unruh Civil Rights Act, the Mobilehome Parks Act, and the Mobilehome Residency Law have distinct statutory purposes and objectives, treat different areas of social concern, and are designed to accomplish independent goals of public policy. Our analysis of their provisions provides no support for plaintiff's contention that the Mobilehome Residency Law and the Mobilehome Parks Act supplanted the Unruh Civil Rights Act with reference to age restrictions in mobilehome-parks tenancies. In the absence of an express legislative declaration of intent to repeal the Unruh Civil Rights Act or to exempt its application to such age restrictions, we decline to find such repeal. Rather, as noted, we are mindful of the presumption against repeals by implication *21 and note that the presumption applies with special force to laws, like the Unruh Act, which have been generally understood and acted upon. (Cal. Drive-in Restaurant Assn. v. Clark, supra, 22 Cal.2d at p. 292.) Had the Legislature intended the effect upon the Unruh Act for which plaintiff contends that body could and would have so declared. (See People v. Brannon (1973) 32 Cal. App.3d 971, 977 [108 Cal. Rptr. 620].)
In reaching this conclusion, we are cognizant, as was the Legislature, of the critical shortage of decent housing available in particular to families with children in California. We are also aware of the social distortions which result from discriminatory practices in the housing market, which further exacerbate the situation confronting such families. (See note, op. cit. supra, 13 Golden Gate L.Rev. at pp. 702-704.) As the Supreme Court commented in Marina Point, Ltd. v. Wolfson, supra: "Finally, the Wolfsons introduced a number of recent studies by various groups documenting the extensive nature of the practice of discrimination against families with children in rental housing that currently exists throughout California. As these and more recent studies revealed, in many of the major metropolitan areas of the state, families with children are excluded from 60 to 80 percent of the available rental housing. (Fn. omitted.)" (30 Cal.3d at pp. 728-729.) This discrimination against such families has imposed an especially critical hardship for low and moderate income families in California, 90 percent of which, according to a 1980 survey, are comprised of a single-parent female who is either unmarried, widowed or divorced. (Note, op.cit. supra, 13 Golden Gate L.Rev. at pp. 699-704, 700 fn. 14.)[27] The factors which coalesced to create the rental shortage include population growth, high interest rates and building costs (which have constricted new apartment construction and the ability of many families to buy a home), condominium conversions, the deterioration of existing housing stock, and the growing divorce rate, which requires two shelters to house persons formerly in one. (Note, op.cit. supra, 13 Golden Gate L.Rev. at pp. 699-700.)
*22 In view of these social realities we would violate our duty to effectuate statutory purpose and to construe where possible statutes harmoniously were we to hold, as plaintiff contends, that the Mobilehome Residency Law and the Mobilehome Parks Act authorize arbitrary discrimination by mobilehome parks against families with children. Our statutory analysis and our duty to effectuate legislative purpose compel us to hold to the contrary. We conclude therefore that blanket discrimination against families with children is impermissible under the Unruh Civil Rights Act in mobilehome-park tenancies (cf. Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721; see also, O'Connor v. Village Green Owners Assn., supra, 33 Cal.3d 790). To hold otherwise would require us to presume that the Legislature, in enacting Civil Code section 798.76 and Health and Safety Code section 18300, subdivision (g)(1), intended to abrogate this state's sound rule of public policy prohibiting all arbitrary discrimination in rental housing. (Cf. Marina Point, Ltd. v. Wolfson, supra, at p. 734; In re Cox, supra, 3 Cal.3d 205, at p. 215.) Without the most cogent and convincing evidence, we cannot attribute to the Legislature such an intent. (In re Cox, supra, at p. 215; see also, Marina Point, Ltd. v. Wolfson, supra.)

III.

Under the Evidence Plaintiff's Mobilehome Park Does Not Qualify as an "Adults Only" Facility Within the Meaning of the Mobilehome Parks Act and the Mobilehome Residency Law.
(12) Having concluded that the Unruh Civil Rights Act does apply to mobile home park tenancies, we must examine the record at bench to determine whether plaintiff's park meets the criteria described in Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721, of an age-restricted housing facility reserved for older citizens, which "can operate as a reasonable and permissible means under the Unruh Act of establishing and preserving specialized facilities for those particularly in need of such services or environment." (30 Cal.3d at pp. 742-743.) The record at bench fails to disclose any evidence that the park possesses such attributes by which it might reasonably claim to be such a specialized facility. Rather, the evidence convincingly proves the contrary. The park has no "particular appurtenances" nor provides "exceptional arrangements" to meet the special needs of elderly residents: the absence of paved pathways within the facility appears incompatible with the needs of many elderly persons, who lack easy mobility and often employ mechanical devices, such as walkers and wheelchairs, to assist them; the absence of a shallow portion of the swimming pool similarly suggests that the pool is not designed to meet the needs of the aged, whose physical condition may well require as a safety measure a readily accessible place to rest during swimming (cf. Marina Point, Ltd. v. Wolfson, *23 supra, at p. 744, fn. 13); moreover, although 80 percent of the park's population is over 50 years of age, a substantial portion of the remaining tenants are under 50, and the park does not reserve residence to the elderly or preclude tenancies to anyone other than minors. Under these circumstances, as in Marina Point, Ltd., supra, plaintiff cannot reasonably claim that its exclusionary policy against children serves any compelling societal interest in meeting the particular needs of the elderly. (30 Cal.3d at p. 743.) The additional fact that children have been part of the park's tenant population and are "always present" as visitors for up to two weeks monthly (see fn. 6, ante) constitutes persuasive proof that the park does not qualify as an age-restricted housing facility for the elderly within the statutory provisions in question. (See Marina Point, Ltd. v. Wolfson, supra, at pp. 742-743.)
The trial court found that plaintiff's "adults only" policy was reasonable by taking into account erroneous factors, such as the reliance of other tenants on the "no children" policy, and the lack of adequate sewage and educational facilities necessary to absorb an added population of families with children. Given the broad protective sweep of the Unruh Civil Rights Act and the fact that substantially all of these considerations arguably applied to the age restrictions invalidated in Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d 721 and O'Connor v. Village Green Owners Assn., supra, 33 Cal.3d 790 we hold that these factors do not as a matter of law provide justification for the age restricted policy. Indeed, their existence would furnish easy circumvention of the Unruh Civil Rights Act in any given case. (Cf. Marina Point, Ltd. v. Wolfson, supra, at p. 744.) We further note that the court below made no finding of any present inadequacy of school facilities. Nor does it appear from the record that educational and sewage facilities could not be expanded if necessary.
On the record before us we therefore hold that plaintiff cannot properly rely upon the narrow exception to the Unruh Civil Rights Act contained in section 798.76 of the Civil Code and section 18300, subdivision(g)(1) of the Health and Safety Code, that its "no children" policy constitutes a violation of the Unruh Civil Rights Act, and that the policy therefore cannot constitute a reasonable rule or regulation within the meaning of Civil Code section 798.56, subdivision (c). Accordingly, defendants' breach of the age restriction contained in his lease cannot as a matter of law constitute a valid basis for his eviction.
In reaching the foregoing conclusion, we discharge our duty to promote the legislative intent, purpose and policy of the Mobilehome Residency Law, the Mobilehome Parks Act and the Unruh Civil Rights Act. Our conclusion also effectuates the fundamental right of the young and elderly alike *24 to equal access to rental housing. (Cf. Marina Point, Ltd. v. Wolfson, supra, 30 Cal.3d at p. 744.) We recognize, however, that our decision may endanger plaintiff's right to continued operation of the Point Dume Mobile Home Park under the Los Angeles County Use Permit. In order to avoid any unjust ramifications to plaintiff, we urge the County of Los Angeles to revise its use permit in conformity with this opinion.
The judgment is reversed. Defendants to recover attorney's fees and costs on appeal.
Reese, P.J., and Cooperman, J., concurred.
NOTES
[1] Our statement of the facts is based upon the trial court's written opinion prepared following the trial and upon the factual statements set forth by the parties in their briefs. Plaintiff has conceded the accuracy of defendants' factual summary but pointed out additional circumstances which we also consider.

In our statement we are, of course, guided by the trial court's factual findings to the extent that they are supported by substantial evidence. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4238, and authorities cited therein.)
[2] The lease in question was a "ground lease" under which the ground upon which the mobilehome occupied by a tenant was leased by him or her from the park. Customarily, an entrant into a mobilehome park did not purchase the land on which his or her mobilehome was placed. Instead, the land was owned, as was the case in Point Dume, by an individual or company, which designated portions of the land as mobilehome rental spaces; those spaces were then leased to owners of mobilehomes for placement in the leased space within the park.
[3] The trial court properly noted: "Technically, only Mr. Zipp was a `tenant' in the park; however, for the purposes of this decision, no distinction in the defendants' status will be considered, no such distinctions having been argued by the parties." Plaintiff never took issue with this conclusion. Therefore we agree that any liability for breach of the subject lease would be Steven Zipp's.
[4] The trial court found that at the time of making the purchase of a mobilehome and entering into a ground lease (see fn. 2, ante) at Point Dume, prospective buyers were informed by sales persons and park personnel of the park's "adult only" restriction; that prospective purchasers and tenants were also given a copy of the park's rules and regulations limiting residency to adults only; and that, upon signing their lease application and the initial lease, prospective purchasers and tenants were furnished with a copy of the conditional use permit.
[5] The trial court concluded that there were no "ultra hazardous" conditions surrounding life in the park, although there was some "potential danger" posed by the movement of cars within the park and the presence of the swimming pool. However, the court determined that neither of these conditions was "sufficiently hazardous" to preclude the presence of children.
[6] The court found that visiting children in varying numbers and of all ages "always" had been at the park.
[7] The court determined that all tenants at Point Dume were on notice regarding the park's rules and regulations, including the "adult only" policy; that in signing their leases and agreeing to abide by these rules, each tenant relied and caused others to rely on a mutual agreement to abide by them; and that defendant Steven Zipp knew that others buying homes in the park expected to be governed by, and would expect him to be governed by, these rules and regulations, including the "adults only" limitation.

Finally the trial court noted that no evidence supported the conclusion that defendant "ever believed, or reasonably relied on any belief," that the park had abandoned its "adults only" policy. In fact, to the contrary, "the evidence [showed] that the defendant tenant was on notice of, and that he never overtly objected to, the `adults only' policy either at the time he signed his lease and considered purchasing a home within the park, or at any time thereafter until he was given a notice of breach."
[8] The trial court found that, despite the few occasions on which "families with older youngsters may have succeeded in violating" the age limitation rule, "no intentional waiver" by the park owners of this requirement had resulted and that there existed no sufficient factual basis for equitably estopping the park from seeking to hold defendants to the terms of their lease on the basis of any "theory of waiver."
[9] Marina Point, Ltd. v. Wolfson (1982) 30 Cal.3d 721 [180 Cal. Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] was decided on February 8, 1982.
[10] The 1982 amendment deleted the term "tenant" and inserted in its stead "homeowner." Far more substantive changes occurred in 1983, among which was deletion of the "same day" provision and substitution of language permitting service of notice within 10 days after notice to the homeowner. The 1982 and 1983 versions of section 798.55, subdivision (b) read respectively as follows:

"(b) The management shall not terminate or refuse to renew a tenancy, except for a reason specified in this article and upon the giving of written notice to the homeowner in the manner prescribed by Section 1162 of the Code of Civil Procedure, to remove the mobilehome from the park within a period of not less than 60 days, which period shall be specified in the notice. A copy of this notice shall be sent to the legal owner and registered owner of the mobilehome, if other than the homeowner, by United States mail on the same day as notice is given to the homeowner, addressed to the legal and registered owners at their addresses, as set forth in the registration card specified in Section 18075.28 of the Health and Safety Code." (Amended by Stats. 1982, ch. 1397, § 24, pp. 5323-5324.)
"(b) The management shall not terminate or refuse to renew a tenancy, except for a reason specified in this article and upon the giving of written notice to the homeowner in the manner prescribed by Section 1162 of the Code of Civil Procedure, to remove the mobilehome from the park within a period of not less than 60 days, which period shall be specified in the notice. A copy of this notice shall be sent to the legal owner, as defined in Section 18005.8 of the Health and Safety Code, each junior lienholder, as defined in Section 18005.3 of the Health and Safety Code, and the registered owner of the mobilehome, if other than the homeowner, by United States mail within 10 days after notice to the homeowner addressed to the legal owner, each junior lienholder, and the registered owner at their addresses, as set forth in the registration card specified in Section 18091.5 of the Health and Safety Code." (Amended by Stats. 1982, ch. 1397, § 24, pp. 5323-5324; Stats. 1983, ch. 519, § 7; Stats. 1983, ch. 1124, § 2, operative July 1, 1984.)
[11] We assume that an owner may have a substantial right which could be jeopardized by removal of the mobilehome from the park. For example, the park may provide enhanced security to the mobilehome by virtue of the park's location, its choice of tenants, and the park's protective facilities, such as walls or fences. Loss of such advantages by removal of the mobilehome could well jeopardize the mobilehome's value by exposing it to an increased risk damage or destruction. Due process, of course, protects substantial rights. (People v. Surety Insurance Co., supra, at pp. 237-239.)
[12] Section 798.55, subdivision (a) provides: "(a) The Legislature finds and declares that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of land-scaping or lot preparation, it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter."
[13] The Legislature did not alter this requirement despite its amendments concerning notice to nontenants. (See fn. 10, ante.)
[14] The section was amended in 1982 and 1983. Former section 798.56 provided: "A tenancy shall be terminated by the management only for one or more of the following reasons: [¶] (a) Failure of the tenant to comply with a local ordinance or state law or regulation relating to mobilehomes within a reasonable time after the tenant receives a notice of noncompliance from the appropriate governmental agency. [¶] (b) Conduct by the tenant, upon the park premises, which constitutes a substantial annoyance to other tenants. [¶] (c) Failure of the tenant to comply with a reasonable rule or regulation of the park as set forth in the rental agreement or any amendment thereto. [¶] No act or omission of the tenant shall constitute such a failure to comply unless and until the management has given the tenant written notice of the alleged rule or regulation violation and the tenant has failed to adhere to the rule or regulation within seven days.

"(d) Nonpayment of rent, utility charges, or reasonable incidental service charges; provided, that the tenant shall be given a three-day written notice to pay the amount due or to vacate the tenancy. The three-day written notice shall be given to the tenant in the manner prescribed by Section 1162 of the Code of Civil Procedure. Such notice may be given at the same time as the 60 days' notice required for termination of the tenancy. Payment by the tenant prior to the expiration of the three-day notice period, or payment by the legal owner, as defined in Section 18007 of the Health and Safety Code, or registered owner, as defined in Section 18010.2 of the Health and Safety Code, if other than the tenant, on behalf of the tenant prior to the expiration of 30 calendar days following the mailing of the notice to the legal owner or registered owner provided in subdivision (b) of Section 798.55, shall cure a default under this subdivision with respect to such payment. The tenant shall remain liable for all payments due up until the time the tenancy is vacated. Cure of a default of rent, utility charges, or reasonable incidental service charges by the legal owner or registered owner, if other than the tenant, as provided by this subdivision, may not be exercised more than twice during the term of the tenancy. [¶] (e) Condemnation of the park.
"(f) Change of use of the park or any portion thereof, provided: [¶] (1) The management gives the tenants at least 15 days' written notice that the management will be appearing before a local governmental board, commission, or body to request permits for a change of use of the mobilehome park. [¶] (2) After all required permits requesting a change of use have been approved by the local governmental board, commission, or body, the management shall give the tenants six months' or more written notice of termination of tenancy. [¶] If the change of use requires no local governmental permits, then notice shall be given 12 months or more prior to the management's determination that a change of use will occur. The management in the notice shall disclose and describe in detail the nature of the change of use. [¶] (3) The management gives each proposed tenant written notice thereof prior to the inception of his tenancy that the management is requesting a change of use before local governmental bodies or that a change of use request has been granted. [¶] (4) The notice requirements for termination of tenancy set forth in Sections 793.56 and 798.57 shall be followed if the proposed change actually occurs. [¶] (5) A notice of a proposed change of use given prior to January 1, 1980, which conforms to the requirements in effect at that time shall be valid. The requirements for a notice of a proposed change of use imposed by this subdivision shall be governed by the law in effect at the time the notice was given."
[15] Statutory prohibitions against retaliatory eviction (Civ. Code, § 1942.5; Gov. Code, § 12955, subd. (f)) are, of course, a significant exception, as are violations of the Unruh Civil Rights Act. (Civ. Code, §§ 51, 53; see Marina Point, Ltd. v. Wolfson (1982) 30 Cal.3d 721 [180 Cal. Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]; Hubert v. Williams (1982) 133 Cal. App.3d Supp. 1 [184 Cal. Rptr. 161]; cf. O'Connor v. Village Green Owners Assn. (1983) 33 Cal.3d 790 [191 Cal. Rptr. 320, 662 P.2d 427] and the Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.)
[16] The section reads: "The provisions of this article shall not affect any rights or proceedings set forth in Chapter 4 (commencing with Section 1159) of Title 3 of Part 3 of the Code of Civil Procedure except as otherwise provided herein."
[17] That a court may consider legislative records and statements of concerned agencies in relation to legislative proposals in determining the intent of the Legislature is clear. (Palmer v. Agee, supra, at p. 384; 5 Witkin, Summary of California Law (8th ed. 1974) Constitutional Law, § 70, p. 3309 and (1984 supp.) § 70, pp. 36-37; see also, Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal.3d 211, 218-219 [185 Cal. Rptr. 270, 649 P.2d 912].)
[18] Section 18005.8 of the Health and Safety Code provides in relevant part: "`Legal owner' means a person holding a security interest in a ... mobilehome...." Section 18005.3 of the code reads in pertinent part: "`Junior lienholder' means a person, other than a legal owner, holding a security interest ... in a mobilehome...."

The 1983 amendments to section 798.55, subdivision (b) occurred as a result of Assembly Bill No. 1052, which extended the time of notice (Stats. 1983, ch. 519, § 18), and Senate Bill No. 1035, which revised the law relating to rental and sale of new and used manufactured homes, mobilehomes, and commercial coaches, altered the remedies available to the parties to a sale, and contained provisions designed to protect and prioritize the interests of the legal owners and junior lienholders. (Stats. 1983, ch. 1124, § 2.)
[19] See footnote 14, ante.
[20] We emphasize that the unlawful detainer action in the case at bench does not arise under subdivision (d), but under subdivision (c), which contains no like provision to that of subdivision (d).
[21] Civil Code section 798.76, enacted in 1978, provides: "The management may require that a purchaser of a mobilehome which will remain in the park, comply with any rule or regulation limiting residence to adults only." As did the trial court, we deem the term "purchaser" to have been employed by the Legislature to mean any lessee; the term was probably employed because section 798.76 is part of article 7, which deals with transfer of mobilehomes.

Health and Safety Code section 18300, subdivision (g)(1) reads: "(g) The provisions of this part shall not prevent local authorities of any city, county, or city and county, within the reasonable exercise of their police powers: [¶] (1) From establishing, subject to the requirements of Sections 65852.3 and 65852.7 of the Government Code, certain zones for manufactured homes, mobilehomes, or mobilehome parks, recreational vehicle parks, temporary recreational vehicle parks, or tent camps within such city, county, or city and county, or establishing types of uses and locations, including family mobilehome parks, adult mobilehome parks, mobilehome condominiums, mobilehome subdivisions, or mobilehome planned unit developments within such city, county, or city and county, as defined in the zoning ordinance, or from adopting rules and regulations by ordinance or resolution prescribing park perimeter walls or enclosures on public street frontage, signs, access, and vehicle parking or from prescribing the prohibition of certain uses for mobilehome parks, recreational vehicle parks, temporary recreational vehicle parks, or tent camps."
[22] Section 51 of the Civil Code provides: "This section shall be known, and may be cited, as the Unruh Civil Rights Act. [¶] All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. [¶] This section shall not be construed to confer any right or privilege on a person which is conditioned or limited by law or which is applicable alike to persons of every sex, color, race, religion, ancestry, or national origin."

Civil Code section 53 provides in pertinent part: "(a) Every provision in a written instrument relating to real property which purports to forbid or restrict the conveyance, encumbrance, leasing, or mortgaging of such real property to any person of a specified sex, race, color, religion, ancestry, or national origin, is void and every restriction or prohibition as to the use or occupation of real property because of the user's or occupier's sex, race, color, religion, ancestry, or national origin is void. (b) Every restriction or prohibition, whether by way of covenant, condition upon use or occupation, or upon transfer of title to real property, which restriction or prohibition directly or indirectly limits the acquisition, use or occupation of such property because of the acquirer's, user's, or occupier's sex, race, color, religion, ancestry, or national origin is void."
[23] Because of our conclusion that the Unruh Civil Rights Act does require invalidation of plaintiff's "adults only" restriction under the facts at bench, we need not address the constitutional issues raised by the parties. We note, nonetheless, that were we to uphold the age restriction under the Unruh Act we would yet be constrained to conclude that the restriction and the statutes purporting to authorize it violate the constitutional guarantee of equal protection of the laws (cf. In re Cox (1970) 3 Cal.3d 205, 216-217 fn. 11 [90 Cal. Rptr. 24, 474 P.2d 992]) as well as, in all probability, the California Constitution's right of privacy. (Cf. City of Santa Barbara v. Adamson (1980) 27 Cal.3d 123 [164 Cal. Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].)

In resting our resolution of the question presented upon statutory grounds, we adhere to the wise jurisprudential principle by which courts are enjoined where possible to avoid determinations based upon constitutional grounds. (See Palermo v. Stockton Theatres, Inc. (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]; In re Henry G. (1972) 28 Cal. App.3d 276, 278-279 [104 Cal. Rptr. 585]; People v. Barton (1963) 216 Cal. App.2d 542, 546 [31 Cal. Rptr. 7].)
[24] We consider that Civil Code section 798.20 demonstrates compatibility of the Mobilehome Residency Law and Mobilehome Parks Act with the provisions of the Unruh Civil Rights Act.
[25] The 1978 amendment to Health and Safety Code section 18300 rewrote former subdivision (a) to include the term "adult mobilehome parks." (See Historical Note, 40 B, West Anno. Health & Saf. Code (1984 ed.) pp. 27-28; Deering's Ann. Health & Saf. Code (1984 ed.) p. 424.)
[26] The Legislature gave careful attention in both the Mobilehome Parks Act and the Mobilehome Residency Law to defining even relatively common terms (see, e.g., Health & Saf. Code, §§ 18201, 18209, 18211, 18214, 18218.5; Civ. Code, §§ 798.2, 798.3, 798.4, 798.8, 798.9, 798.12). Moreover, that body in other areas of the law designed to meet the special needs of elderly persons has provided express definitions of the terms "elderly," "aged" and "senior citizen" (see, e.g., Health & Saf. Code, §§ 50670, 19901; Rev. & Tax. Code, §§ 20505, 20640.3, subd.(c), 20626, 20582, and 17262, subd.(f)). Many of these enactments occurred after the decision in Marina Point, Ltd. v. Wolfson, supra.

Civil Code section 25.1 defines "adult" generally as a person 18 years of age or older but "the term could embrace a variety of more narrowly defined adult-only rules." (65 Ops.Cal. Atty. Gen. 559, 561-562 (1982).)
[27] We cannot ignore the enormous social costs which arise from the shortage of shelter for families with children as a result of discrimination. These include arbitrary clustering in certain areas, thereby creating dislocations requiring additional schools, transportation, increased police protection and recreational facilities, as well as enhanced burdens upon the control of traffic within such areas. Moreover, the clustering "correlates with the concentration of minorities and women and creates segregated living patterns based on race and sex. (Fn. omitted.) Racial imbalance in public schools has intensified as middle-class rentals are forced out of the cities by the unavailability of affordable and desirable housing and as minority renters are excluded from the suburbs by high rents." Finally, a family discriminated against in the housing market must compete with other families for the remaining available shelter, thereby forcing families "to live in undesirable neighborhoods or to pay higher rents than they would otherwise pay." (Note, op.cit. supra, 13 Golden Gate L.Rev. at pp. 700-701.)